**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FRANCISCO ALANIZ GARCIA,
*Petitioner-Appellee*,

v.

DAVID LONG,
*Respondent-Appellant*.

No. 13-57071

D.C. No.
5:12-cv-00865-SVW-SS

OPINION

On Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
June 3, 2015—Pasadena, California

Filed December 21, 2015

Before: Raymond C. Fisher and Jay S. Bybee, Circuit
Judges, and Elizabeth E. Foote, District Judge.[*]

Opinion by Judge Bybee

---

[*] The Honorable Elizabeth E. Foote, District Judge for the U.S. District Court for the Western District of Louisiana, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's judgment granting Francisco Alaniz Garcia a writ of habeas corpus in a case in which Garcia, after an interrogating officer read him his *Miranda* rights and confirmed that he understand those rights, responded with a simple "no" to the officer's question asking if he wished to talk.

Applying AEDPA's deferential standard of review, the panel held that the California Court of Appeal's decision that Garcia's "no" response was ambiguous and equivocal in light of other statements he made during the interview is both contrary to and unreasonable application of established Supreme Court law, and is based on an unreasonable determination of the facts. The panel held that the trial court's error in not suppressing Garcia's interrogation tape and apology letter was prejudicial.

### COUNSEL

Kamala D. Harris, Attorney General of California, Julie L. Garland, Senior Assistant Attorney General, Kevin Vienna, Supervising Deputy Attorney General, Jennifer A. Jadovitz (argued), Deputy Attorney General, San Diego, California, for Respondent-Appellant.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Hilary Potashner, Acting Federal Public Defender, Margo A. Rocconi (argued), Deputy Federal Public Defender, Los Angeles, California, for Petitioner-Appellee.

**OPINION**

BYBEE, Circuit Judge:

Francisco Alaniz Garcia was brought into the police station for questioning about allegations that he had sexually molested his granddaughter. After reading Garcia his *Miranda* rights and confirming that Garcia understood those rights, the interrogating officer asked, "now having [those rights] in mind, do you wish to talk to me?" Garcia responded with a simple "no." The Supreme Court in *Miranda v. Arizona* said that when a suspect "indicates in any manner . . . that he wishes to remain silent, the interrogation must cease." 384 U.S. 436, 473–74 (1966). The officer did not cease, and he continued questioning Garcia and ultimately obtained a confession. At his subsequent trial, the court, over Garcia's objection, allowed the prosecution to play the three-and-a-half-hour confession tape to the jury.

The California Court of Appeal determined that Garcia's "no" response was ambiguous and equivocal in light of other statements Garcia made during the interview and accordingly rejected Garcia's *Miranda* claim. The Court of Appeal also concluded that, even if erroneous, the playing of Garcia's confession was harmless beyond a reasonable doubt.

We hold that any reasonable jurist would have to conclude that "no" meant "no." The Court of Appeal's

decision is both contrary to and an unreasonable application of clearly established Supreme Court law, and it is based on an unreasonable determination of the facts. Further, the trial court's error was not harmless. We affirm the district court's judgment granting the writ of habeas corpus.

## I. FACTS

### A. *The Interrogation*

In early 2007, sixteen-year-old Jane Doe told members of her family that she had been sexually assaulted by Garcia, her step-grandfather, for years. Jane had often spent weekday afternoons, weekends, and school vacations with her grandmother, Elsa Alaniz, and Garcia, Alaniz's then-husband. Jane was often left alone with Garcia while her grandmother was working.

Several months after she told her family, Jane told Child Protective Services about the molestations. Child Protective Services then informed the police, and Moreno Valley Police Detective Richard Beatty brought Garcia into the police station for questioning.

After asking some preliminary questions—how Garcia spelled his name, whether he had any hobbies, what he did for work, and so on—Detective Beatty told Garcia that he wanted to "talk to [him] about some things," but before he could do that, he was going to "read [him] something real quick." Detective Beatty then read Garcia his *Miranda* rights:

> Q: Okay, you have the right to remain silent.
> Anything you say may be used against you in

the court, okay.  You have the right to an
attorney before and during any questioning,
and if you cannot afford to hire an attorney,
one will be appointed for—to you free of
charge.

A:  Okay.

Q:  Okay?  Do you understand that?

A:  Right.

Detective Beatty then asked the critical question:  "Okay,
now having that [i.e., your *Miranda* rights] in mind, do you
wish to talk to me?"  Garcia's complete answer was "No."

   Detective Beatty pressed on, asking, "No?"  This time,
Garcia elaborated:  "No, because I don't want to, uh, I don't
know what to—what is these charges or, uh . . . ."  Another
officer, Detective John Lenton, then cut in, saying, "Well,
you don't want to talk to us because you don't know the
charges. . . . You're telling [us] we can't tell you about it."
Garcia told the detectives, "you say you have a right to—to
remain, you know . . . ," and added, "I don't want to, you
know, say something or if—if I don't know what's going on."
At last, Garcia told the detectives he wanted to hear why he
had been brought in.

   Detective Beatty told Garcia he had been brought in
because Jane alleged that he had abused her.  Reminding
Garcia that "you said that you didn't want to talk to us,"
Detective Beatty then asked, "so is it my understanding right
now that you do want to talk to me then?"  Garcia
equivocated:  "Well, the—the point . . . you know, again, uh,

with all respect, you know, when you say you—you have right to remain, you know . . . until you . . . get a lawyer." Detective Beatty then asked again whether Garcia wanted to talk, and Garcia finally agreed, saying, "Yeah, we can talk, yeah, I guess, why not."

During the ensuing interview, Garcia at first steadfastly denied any sexual contact with Jane. When asked if he inappropriately touched Jane, he answered, "Well, of course not, I didn't do it." When asked how old Jane was when something first happened, he answered, "No, no, no, no." Ultimately, however, he admitted to three incidents. All three times, he claimed, Jane initiated the sexual contact. He claimed that all three incidents occurred when Jane was fifteen years old and denied ever having sexual intercourse or oral sex with Jane.

At Detective Beatty's suggestion, Garcia wrote a letter of apology to Jane, telling her he never meant to hurt her and she was not "guilty of anything." At the end of the interview, Garcia was placed under arrest.

B. *The Trial*

Garcia was tried on one count of forcible rape of a minor and eight counts of committing lewd and lascivious acts on a minor. At trial, the prosecution called Jane as a witness. Jane recalled one instance in which she performed oral sex on Garcia when she was six or seven years old, but she testified that this was not the first time he forced her to perform oral sex on him. Jane knew she was supposed to give Garcia oral sex whenever he removed his pants. She testified that she performed oral sex on Garcia as often as ten to fifteen times each month when she was between the ages of six and fifteen.

Jane also testified that Garcia forced her to have sexual intercourse with him once or twice each year for seven or eight years. She testified that the first act of intercourse occurred when she was six or seven and the last occurred shortly before she turned age fifteen. The intercourse hurt, and Garcia covered Jane's mouth to stop her from yelling or screaming. Jane testified that she did not tell anyone about the molestations because she feared for her safety and that of her grandmother.

On the fourth day of trial, the prosecutor sought to play the recording of Garcia's police interview to the jury. As the audio recording started to play, defense counsel made a sidebar objection and moved to suppress the confession based on Garcia's invocation of his right to remain silent under *Miranda*. The judge denied the motion, ruling that Garcia's response—"no"—to Detective Beatty's question—"now having that in mind, do you wish to talk with me?"—was equivocal. The prosecutor then proceeded to play the entire audio recording (lasting three hours and forty-five minutes) to the jury. The next court day, the prosecutor read to the jury the apology letter that Garcia wrote to Jane toward the end of the interrogation.

Garcia did not testify, and his lawyer presented no affirmative defense. At closing arguments, Garcia's counsel began by telling the jury, "I'm not going to stand up here before you and say that Mr. Garcia never touched [Jane Doe]. I think that would be foolish. And I don't think any of you would ever believe that he didn't touch her. Of course he did by his own words." Garcia's counsel said little about the eight counts of committing lewd and lascivious acts on a minor. He told the jury, "You probably have your minds made up with regards to those." Instead, he focused on the

rape charge and argued that the State had not shown beyond a reasonable doubt that Garcia had *forced* Jane to have sex.

During the State's closing, the prosecutor, after first recounting Jane's testimony, focused the jury's attention on the interrogation:

> [O]bviously I played that tape for you for a reason. Knowing that he would be denying these things happened. Why? What's important to take from that tape[,] hearing the defendant and his pack of lies? How does that support that we know [Jane Doe] is the one who's told us the truth?

The prosecutor told the jury that the tape "lets us know what kind of man he is." The tape also showed, according to the prosecutor, that Jane, not Garcia, was telling the truth. Garcia "had to keep flip-flopping" and "couldn't keep the story straight," whereas Jane had "always told the same truth."

After two and a half hours of deliberating, the jury found Garcia guilty on all counts. Garcia was subsequently sentenced to thirty-five years to life.

C. *Direct Appeal*

Garcia appealed his conviction to the California Court of Appeal, arguing, among other things, that the interrogation tape and apology letter were admitted at trial in violation of *Miranda*. The court affirmed Garcia's conviction in an unpublished opinion.

The court concluded that Garcia never unequivocally invoked his right to silence because his "no" response was "equivocal under the circumstances." The court pointed out that earlier in the interview, in response to questions about whether Garcia went by other names or had ever been arrested, Garcia initially answered "no," but then "proceeded to provide additional or contrary information despite his initial negative response." The court thus concluded that "the *context* in which the ['no'] response was made here shows it was an ambiguous response."

The court also determined that "[f]urther ambiguity was cast upon [Garcia's] initial 'no' response when [he] answered the detective's clarifying question." By saying, "No, because I don't want to, uh, I don't know what to—what is these charges or, uh . . . ," the court reasoned, Garcia "indicated [that] his desire to remain silent was qualified based on his lack of knowledge or understanding concerning what charges or allegations had been made against him." The court thus held that the detective was free to continue questioning Garcia and rejected the *Miranda* claim. The court also held that, in any event, the admission of Garcia's police station interview statements "could not have affected the jury's guilty verdicts in counts 1 through 9 and was therefore harmless beyond a reasonable doubt."

The California Supreme Court summarily denied Garcia's petition for review.

D. *Federal Habeas Proceedings*

Garcia filed a petition for a writ of habeas corpus, and the district court, adopting the magistrate judge's recommendation, granted relief on Garcia's *Miranda* claim.

The district court determined that the state court's use of Garcia's *postrequest* statements to cast ambiguity on his request to remain silent was contrary to the Supreme Court's decision in *Smith v. Illinois*, 469 U.S. 91 (1984) (per curiam). And, the district court concluded, the state court's finding that Garcia's request was ambiguous in light of his *prerequest* statements was an unreasonable determination of the facts. The district court explained that although Garcia "expanded on his initial negative response to two . . . booking questions cited by the state court, . . . [t]his shows only that Garcia was prone to provide more information when prompted by the officers.        Garcia's    supplemental    responses,    viewed objectively, do not show that his use of the word 'No' was ambiguous."  The district court accordingly granted Garcia's habeas petition.  We have jurisdiction to review the district court's decision under 28 U.S.C. § 2253.

## II.  STANDARD OF REVIEW

We review a district court's order granting an application for habeas relief de novo. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004).  In doing so, we look to the last reasoned state court decision. *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal habeas relief is only available if the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1), (2).

## III.  DISCUSSION

The California Court of Appeal determined that Garcia's "no" response to Detective Beatty's question whether Garcia wanted to talk was ambiguous and equivocal in light of prior and subsequent statements Garcia made during the interrogation.  The court also determined that even if the interrogation and apology letter should have been suppressed, any error was harmless beyond a reasonable doubt.  Applying AEDPA's deferential standard of review, we hold that the Supreme Court's decisions in *Miranda* and subsequent cases required the suppression of the interrogation tape and apology letter.  Because we also conclude that the admission of this evidence at trial was prejudicial, we affirm the district court's decision granting the writ.

A. *AEDPA Review of the State Court's* Miranda *Determination*

"The state court decision here collides with AEDPA on all grounds." *Anderson v. Terhune*, 516 F.3d 781, 786 (9th Cir. 2008) (en banc).  It is both contrary to and an unreasonable application of clearly established Supreme Court law, and it is based on an unreasonable determination of the facts.

In *Miranda v. Arizona*, the Supreme Court held that whenever a criminal suspect is subjected to custodial interrogation, he must be advised of certain rights now familiar to all, including his right to remain silent.  384 U.S. 436, 444 (1966).  When the police fail to give the required warnings, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant." *Id.*  When the police do give

the warnings, the Court explained, the suspect has a "right to cut off questioning" that must be "scrupulously honored": "If the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 479 (emphasis added).

The Supreme Court has subsequently clarified that the suspect's right to cut off police questioning is triggered only when the suspect *unambiguously and unequivocally* invokes it, by invoking either the right to remain silent or the right to counsel. *See Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010) (right to remain silent); *Davis v. United States*, 512 U.S. 452, 458–59 (1994) (right to counsel). Thus, remaining "largely silent" during an interrogation, *Berghuis*, 560 U.S. at 375 (brackets and internal quotation marks omitted), or saying "Maybe I should talk to a lawyer," *Davis*, 512 U.S. at 455, is not enough; when it is objectively unclear whether the suspect is invoking his *Miranda* rights, the police may continue to ask questions.

The Supreme Court's decisions in *Berghuis* and *Davis* are not, however, a license for the police or the courts to override a suspect's clearly expressed request to remain silent. As the Court explained in *Berghuis*, when a suspect "simpl[y]" says he wants to remain silent or says he does not want to talk with the police, he has "invoked his right to cut off questioning." 560 U.S. at 382 (internal quotation marks omitted). "[A] suspect need not 'speak with the discrimination of an Oxford don.'" *Davis*, 512 U.S. at 459 (quoting *id.* at 476 (Souter, J., concurring)). Rather, he need only "articulate his desire to [remain silent or] have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [such] a request." *Id.*

In *Smith v. Illinois*, the Supreme Court explained that "[w]here nothing about the request . . . or the circumstances leading up to the request would render it ambiguous, all questioning must cease." 469 U.S. 91, 98 (1984) (per curiam). In such circumstances, the Court held, it is improper for an officer to attempt to clarify the request; indeed, there is nothing to "clarify." Accordingly, if an officer seeks to clarify an unambiguous request and elicits an equivocal response, the suspect's postrequest statements "may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 100.[1]

The Supreme Court has thus clearly established the following points of law: First, an unambiguous and unequivocal *Miranda* invocation "cuts off" questioning—even questioning intended to clarify that the accused is invoking his *Miranda* rights. *See Berghuis*, 560 U.S. at 382 (explaining that if the accused makes a "simple" statement that he wants to remain silent, he invokes "his right to cut off questioning" (internal quotation marks omitted)); *Smith*, 469 U.S. at 98 ("Where nothing about the request for counsel or the circumstances leading up to the request would render it

---

[1] We have previously avoided relying on the Supreme Court's invocation-of-counsel precedents as "clearly established" law in right-to-silence cases. *See, e.g.*, *Anderson*, 516 F.3d at 787 n.3 ("We rely on *Miranda* and *Mosley*, not *Davis*, as 'clearly established' law."). Since then, however, the Supreme Court has held—in an AEDPA case—that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel." *Berghuis*, 560 U.S. at 381 (applying *Davis* in a right-to-silence case). Following the Supreme Court's lead, we accordingly treat the Supreme Court's invocation-of-counsel precedents (e.g., *Smith* and *Davis*) as "clearly established" law, even though this is a right-to-silence case.

ambiguous, all questioning must cease."). Second, an ambiguous or equivocal *Miranda* invocation "do[es] not require the cessation of questioning." *Davis*, 512 U.S. at 459. Finally, in determining whether a request is ambiguous or equivocal, the court must apply an objective inquiry: "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (internal quotation marks and citation omitted).

No one here contends, and the state court did not find, that Garcia's "no" was ambiguous or equivocal on its face. The question asked—"now, having [your *Miranda* rights] in mind, do you wish to talk to me?"—was clear as day. So too was Garcia's one-word response. Neither the detective nor Garcia equivocated by using words such as "maybe" or "might" or "I think." *Anderson*, 516 F.3d at 788; *cf. Smith*, 469 U.S. at 96–97 (nothing in the statement "Uh, yeah, I'd like to do that" suggested equivocation).

The question, then, is whether Garcia's request to remain silent was somehow ambiguous or equivocal in the context of the whole interrogation. The California Court of Appeal reasoned that "ambiguity was cast upon [Garcia's] initial 'no' response when [he] answered the detective's clarifying question by telling him: 'No, because I don't want to, uh, I don't know what to—what is these charges or, uh . . . .'" That is, the Court of Appeal ruled that Garcia's postinvocation response rendered his prior "no" ambiguous.

This reasoning was foreclosed by *Smith*, a decision the Court of Appeal did not cite. When Smith was asked whether

he understood his right to have a lawyer present, he responded, "Uh, yeah, I'd like to do that." *Smith*, 469 U.S. at 97. "Instead of terminating the questioning at this point," the detective "pressed him again," asking, "Do you wish to talk to me at this time without a lawyer being present?" *Id.* at 93. The Supreme Court held that the detective's clarifying question was improper, and Smith's equivocal response ("Yeah and no, uh, I don't know what's what, really.") could not be used "to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 93, 100 (emphasis omitted). The Court explained that *Miranda* was a "bright-line prohibition"—a rule necessary to prevent the authorities from "wear[ing] down the accused and persuad[ing] him to incriminate himself notwithstanding his earlier request." *Id.* at 98. The California Court of Appeal's use of Garcia's postrequest statements to call his initial "no" into question was "contrary to" this bright-line rule. *See* 28 U.S.C. § 2254(d)(1).

The Court of Appeal also determined that Garcia's request was rendered ambiguous by his conduct during the booking portion of the interview, which was before the officers gave him his *Miranda* warning. *See Smith*, 469 U.S. at 99–100 (reserving the question whether "an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request"). The court highlighted the following colloquy:

> Q: Do you ever go by any other names?
>
> A: No.
>
> Q: No? And where . . . .

A: Well, yeah, yeah, before you continue, sir. Uh, a long time ago when I was, uh, uh, illegal in this country, oh, so many years, I used, uh, Francisco Lopez.

. . . .

Q: Okay.  Were you ever in the military?

A: No.

Q: No?

A: No.

Q: Have you ever been arrested before?

A: No.

Q: No?

A:   No, in  .  .  .  '81 in Fullerton where I—where I used to live . . . they detained me . . . they let me . . . go.

The Court of Appeal found that because Garcia had twice "provide[d] additional or contrary information despite his initial negative response," he had "used the term 'no' inconsistently." The court thus reasoned that Garcia's answer "no" to Detective Beatty's question whether he wanted to talk was ambiguous "in the context of his preceding conversation with the detective."

Although we give considerable deference to the state courts, "AEDPA deference is not a rubber stamp." *Anderson*, 516 F.3d at 786 (citing *Miller-El v. Dretke*, 545 U.S. 231, 240, 265 (2005)). The California Court of Appeal's determination that Garcia's "no" was ambiguous, based on just two instances in which he supplied additional information after an initial "no" response, was both an unreasonable application of Supreme Court law and an unreasonable determination of the facts presented in the state court proceedings.

To begin with, there was nothing "inconsistent" or "contrary" about Garcia's statements after his initial "no" responses earlier in the interrogation. Garcia's statement that he had gone by the name Francisco Lopez "a long time ago" when he was "illegal in this country" was consistent with his initial answer "no" when asked, using the present tense, "Do you ever go by any other names?" If anything the officer's question was ambiguous, and Garcia expanded on his answer to ensure it was complete. But his "no" was a complete and accurate response to the question actually asked: "Do you ever go by any other names?"

Likewise, Garcia's second statement that twenty-six years earlier he was "detained" and "let . . . go" was consistent with his initial answer "no" when asked, "Have you ever been arrested before?" Garcia explained that the police "took me to the. . . police station . . . , but . . . they [did]n't arrest me." Again, he offered a complete explanation, consistent with his "no" answer: he had not been arrested, although he was once brought in for questioning and then released. The original "no" was not ambiguous.

At most, these two instances show that the detectives could get Garcia to volunteer information that was relevant but not directly responsive to the question asked by repeating his initial answer back to him. If he answers "no" when the police ask if he has any brothers, he may volunteer that he does have a sister. If he answers "no" when the police ask if he went to college, he may volunteer that he did finish high school. Under the state court's logic, because Garcia has volunteered information twice before, it is legitimate for the police to ask a clarifying question after he has unambiguously invoked his *Miranda* rights because perhaps he will volunteer more information a third time.

This logic is an objectively unreasonable application of the Supreme Court's precedents. *See* 28 U.S.C. § 2254(d)(1). That the police, through previous questioning, may have succeeded in getting a suspect to supplement his answer does not mean that the police may then badger the suspect after he has unambiguously invoked his right to remain silent because he may once again supplement his answer. Under established Supreme Court law, although context may be relevant to determining whether a request is ambiguous, "it simply cannot be manufactured by straining to raise a question regarding . . . a facially unambiguous invocation of the right to silence." *Anderson*, 516 F.3d at 787 (citing *Davis*, 512 U.S. at 459, and *Miranda*, 384 U.S. at 473–74).

*Miranda* could not have been more clear on this point: when an "individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease*." 384 U.S. at 473–74 (emphasis added). Once he has exercised "the right to cut off questioning," his right must be "scrupulously honored." *Id.* at 474, 479. This "bright-line" rule is designed to protect

interrogated suspects from police "'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional." *Smith*, 469 U.S. at 98 (alteration in original). The California Court of Appeal's decision is an unreasonable application of these clear commands.

The Court of Appeal's strained interpretation of Garcia's request also constitutes an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). The state court found that Garcia's "no" was ambiguous in two ways. First, the court found that Garcia's request was ambiguous because it may have been "qualified based on his lack of knowledge or understanding concerning what charges or allegations had been made against him." But nothing in Garcia's *prerequest* statements supports that finding. At no point before he asked to remain silent did Garcia say he wanted to know what allegations had been made against him or suggest that he would not talk unless he knew why he had been brought in. "No" is not a qualified answer, and if it was "based on his lack of knowledge or understanding" of the charges, it was his privilege to remain silent. The officers were not entitled to explore the reasons for his answer even if they suspected that his reasons were thin or misguided.

Second, the court found that Garcia's "no" was ambiguous because it may not have been "genuine." But again, nothing in Garcia's prerequest statements supports this finding. The state court points to just two instances in which Garcia volunteered information after he initially answered a question with a "no." But both instances involved a question about historical facts; neither question had anything to do with Garcia's present willingness to talk. And, as we have explained, there was nothing inconsistent about the two supplemental responses identified by the state court. "No,"

he does not ever go by any other names, but he did a long time ago. And "no," he has not ever been arrested, but once he had been detained and let go. When Garcia said "no" to prior questions, as he explained, he actually meant "no." The officers had no reason to believe that Garcia was answering questions contrary to what he meant.

Indeed, the state court's view of the record is belied by the interrogating officers' own statements during the interview. *Cf. Hurd v. Terhune*, 619 F.3d 1080, 1089 (9th Cir. 2010) ("[T]he interrogating officers' comments show that they subjectively understood Hurd's responses as unambiguous refusals."). Neither officer ever suggested he believed Garcia's "no" was not genuine. To the contrary, the first thing Detective Lenton said after Garcia made his request was "Well, you don't want to talk to us because you don't know the charges." He added, "You just said you didn't want to talk to us because you don't know what we're gonna talk to you about." After telling Garcia about his granddaughter's allegations, Detective Beatty again told Garcia, "Okay, well, I mean, you said that you didn't want to talk to us."[2]

The officers were correct. The only reasonable reading of the record is that Garcia told the officers that he wanted to remain silent. Quite literally, however, the officers did not take "no" for an answer. The Supreme Court has made clear that when a suspect makes the "simple" statement that he

---

[2] It is of no moment that the officers characterized Garcia's request as a refusal to talk because Garcia did not know why he had been brought in. As we have explained, Garcia only expressed a desire to know what allegations were being made against him *after* he unambiguously invoked his right to remain silent.

wants to remain silent, he invokes "his right to cut off questioning." *Berghuis*, 560 U.S. at 382 (internal quotation marks omitted). By continuing to ask questions, the officers failed to "scrupulously honor" Garcia's simple request.

We accordingly hold that 28 U.S.C. § 2254(d) does not bar habeas review of Garcia's *Miranda* claim, and we conclude, on de novo review, that Garcia's constitutional rights were violated when his interrogation tape was played and his apology letter was read at trial.

B. *Harmless Error Review*

*Miranda* error does not entitle Garcia to habeas relief if the error was harmless. In habeas proceedings, we apply the actual-prejudice standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, habeas relief is only available if the constitutional error had a "substantial and injurious effect or influence" on the jury verdict or trial court decision. *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This standard is satisfied if the record raises "grave doubts" about whether the error influenced the jury's decision. *Davis v. Ayala*, 135 S. Ct. 2187, 2203 (2015) (brackets omitted) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Under AEDPA, we accord deference to a state court's harmlessness determination. Nevertheless, because the *Brecht* standard that we apply on collateral review is "less onerous" for the state than the "harmless beyond a reasonable doubt" standard that state courts apply on direct review, *Brecht*, 507 U.S. at 622–23 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)), the Supreme Court has explained that "it certainly makes no sense to require formal application

of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former." *Fry v. Pliler*, 551 U.S. 112, 120 (2007); *accord Ayala*, 135 S. Ct. at 2198. We therefore apply the *Brecht* test, but we do so with due consideration of the state court's reasons for concluding that the error was harmless beyond a reasonable doubt.

In *Brecht*, the Supreme Court determined that the state's improper use of the petitioner's post-*Miranda* silence for impeachment purposes was harmless. 507 U.S. at 638–39. The Court noted that "[t]he State's references to petitioner's post-*Miranda* silence were infrequent, comprising less than two pages of the 900-page trial transcript in this case." *Id.* at 639. And those references were cumulative in light of "the State's extensive and permissible references to petitioner's pre-*Miranda* silence." *Id.* Moreover, because the physical evidence presented at trial suggested that the petitioner had intentionally shot the victim, "the State's evidence of guilt was, if not overwhelming, certainly weighty." *Id.*

We cannot say the same here. Although Jane Doe's trial testimony was no doubt detailed and powerful, her testimony was uncorroborated by physical evidence. A physician was called simply to testify that it would have been futile to examine Jane or to collect DNA evidence. And further, the improperly admitted evidence did not, as in *Brecht*, merely consist of "infrequent" references comprising less than two of 900 pages of transcript. The entire tape, lasting three hours and forty-five minutes, was played to the jury, and the entire apology letter, translated to English, was read to the jury.

The prejudice from a defendant's confession "cannot be soft pedaled." *Anderson*, 516 F.3d at 792. "A confession is like no other evidence"; it may be "the most . . . damaging

evidence that can be admitted" against a defendant. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks omitted). The jury heard Garcia admit to specific instances of sexual misconduct with Jane. He said on the tape that he hated himself for what he did and he felt like scum. More than that, Garcia's initial denial of the allegations and subsequent contradictory admission seriously undermined his own credibility and correspondingly bolstered Jane's credibility.

The State argues that Garcia did not actually confess to any crimes during the interrogation—he only admitted to three incidents when Jane was fifteen years old (the crimes charged require that the victim be under fourteen), and he claimed it was Jane who initiated the sexual contact. Nonetheless, the prosecutor relied heavily on Garcia's admissions to argue that the jury should believe Jane's testimony. During closing arguments the prosecutor asked the jury, "What's important to take from that tape[,] hearing the defendant and his pack of lies? How does that support that we know [Jane Doe] is the one who's told us the truth?" The prosecutor continued:

> Remember the way he denies it? So adamant no, no, no, no. It's always no, no, no, very adamant.
>
> . . . .
>
> [H]e sounds so convincing; right? He's saying, oh, my story is true. I don't know why she would say that. Ever see you naked? No, no, no. I haven't done anything wrong. Why don't you believe me? He's pleading. I

haven't done anything. Why don't you
believe me?

          . . . .

Well, then he changes his story, as we know.

The prosecutor then explained how Garcia's story changed,
step by step. First, Jane came on to him, started touching
him. "Then he says, oh, I just couldn't resist her." Finally he
says, "I started touching and licking her, kissed her breast."

The prosecutor also pointed out how Garcia "changed the
year all of a sudden." "He says first, oh, back in 2000, maybe
2001. The officers said 2000, 2001? Yeah, 2000, 2001. Oh,
wait. . . . [S]he's what, 17 now? No. 2005." This, the
prosecutor explained, showed that "[h]e got caught there and
tried to correct himself."

The prosecutor summed up by telling the jury members
they had to decide whose word to believe—Garcia's, in his
confession, or Jane's, at trial:

> Ladies and gentlemen, when it's time for
> you to deliberate, as I told you at the
> beginning of this case, that it's your job to
> kind of get to the truth. Are you okay with
> that task? Part of that task is deciding what
> you believe and what you don't. You have
> heard from [Jane Doe]. You have heard the
> audio from the defendant.
>
> Who couldn't keep the story straight?
> Who had to keep flip-flopping? Who

admitted that he was sexually attracted to his own granddaughter?

On the other hand, who has always told the same truth, the same shameful, painful and tearful truth that we saw up there? [Jane Doe].

In short, Garcia's interrogation statements were the focal point of the prosecution's closing argument. According to the prosecutor, Garcia's "pack of lies" showed that Jane was telling the truth, and Garcia's admission of sexual misconduct "lets us know what kind of man he is." In the absence of any significant evidence, physical or otherwise, corroborating Jane's testimony, the interrogation tape and apology letter substantially strengthened the government's case.

The State argues that even if Garcia's interrogation statements and apology letter had been suppressed, Garcia would still have been convicted of the charged crimes. The State first notes that, under California law, Jane's testimony was sufficient to support a guilty verdict. But the question under *Brecht* is not whether the properly admitted evidence would have been sufficient; it is whether the improper evidence had a substantial and injurious effect or influence on the jury. Given the record here—in particular the prosecution's closing argument—we conclude it did.

The State also notes that Jane's grandmother (Garcia's former wife) testified at trial that she asked Garcia how he could have hurt Jane and that Garcia, instead of denying wrongdoing, said he was sorry and told her that "God . . . forgives." To be sure, this testimony was harmful to Garcia's case. But still, the grandmother's testimony that Garcia

admitted to hurting Jane in unspecified ways was not nearly as compelling as Garcia's taped admission that he had engaged in multiple specific sexual acts with Jane. Nor did the grandmother's testimony enable the prosecution to make effective use of Garcia's "flip-flopping." It was no accident that the prosecutor's closing arguments pored over Garcia's interrogation statements while noting only in passing Garcia's implicit admission to Jane's grandmother.

The California Court of Appeal determined that any *Miranda* error was harmless beyond a reasonable doubt because "defense counsel essentially conceded that [Garcia] was guilty of the lewd act offenses charged in counts 2 through 9." But defense counsel only conceded Garcia's guilt on the lewd act offenses because the improperly admitted interrogation tape left him no other choice. Defense counsel told the jury:

> Now, with regards to these molestation charges, we know we have Counts 2 through 9. Mr. Garcia in his own words to the investigator, he said he touched her. He said he touched her on three different occasions. He told you how it happened. He wasn't denying it.

> The difference between his testimony or his statements and that of [Jane Doe] is when it started. . . . But I'm not going to argue too much about the 288 charges. You probably have your minds made up with regards to those.

Far from showing that the admission of the interrogation tape was harmless beyond a reasonable doubt, defense counsel's closing argument shows that the tape was indeed damning. Counsel was forced to admit that, in his own words, Garcia said he touched Jane Doe, explained how it happened, and "wasn't denying it." The admission of Garcia's confession plainly affected counsel's strategy—he could not deny that Garcia had molested Jane but could only dispute the rape charge by arguing that Garcia never used force or fear.

The state court also rested its harmlessness determination on its conclusion that "the jury could not have used [Garcia]'s interview statements to convict him of the rape charge." In particular, the court reasoned, the prosecution urged the jury to convict Garcia of rape based on an incident of forced sexual intercourse when Jane was six or seven years old, but Garcia "steadfastly denied ever having sexual intercourse with Jane" and denied any sexual contact with her when she was six or seven years old. As we have explained, however, this argument misses the point. That Garcia's interrogation statements, standing alone, were insufficient to prove his guilt does not mean that they did not substantially influence the jury's verdict. As the prosecutor told the jury, "obviously I played that tape for you for a reason." The jury had heard Garcia in his own voice—he "couldn't keep the story straight," he "had to keep flip-flopping," and he "admitted that he was sexually attracted to his own granddaughter." Any reasonable application of *Chapman* would have to account for these statements by the prosecution, yet the state court never acknowledged them.

Exercising "extreme caution," as we must, "before determining that the admission of [a] confession at trial was harmless," *Fulminante*, 499 U.S. at 296, we conclude that the

admission of Garcia's interrogation and apology letter had a substantial and injurious effect on the jury's decision. *Brecht*, 507 U.S. at 637–38. The state court's error was not harmless.

## IV. CONCLUSION

The Supreme Court has repeatedly made clear that when a suspect simply, unambiguously, and unequivocally says he wants to remain silent, police questioning must end at once. Under any reasonable interpretation of the facts, Garcia simply, unambiguously, and unequivocally invoked that right. Accordingly, clearly established Supreme Court law required the suppression of Garcia's interrogation tape and apology letter. We affirm the district court's judgment granting the writ of habeas corpus. The State shall, within the time prescribed by the district court, either release Garcia or grant him a new trial.

**AFFIRMED.**