O’SCANNLAIN, Circuit Judge,
dissenting:
A suspect who wishes to invoke his Fifth Amendment right to silence must do so “unambiguously.” Berghuis v. Thompkins, 560 U.S. 370, 381-82, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). Well into his interrogation, the suspect in this case made a single statement that, standing alone, might be characterized as an unambiguous invocation of such right. The California courts determined, however, that the suspect’s statement was not unambiguous when considered in full context. Whether one believes that determination to be correct or not, it unquestionably rests on a reasonable application of clearly established Supreme Court law to the facts of the case before us — and it must therefore *1143 stand under our deferential standard of review. See 28 U.S.C. § 2254(d); Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).
In reaching its conclusion to the contrary, the majority faults the state court for failing to apply Supreme Court precedent that post-dates the state court’s decision, attempts to extend readily distinguishable Supreme Court precedent to circumstances the Court has never considered, and ultimately grants relief to Jones because the state court’s decision failed to conform to the majority’s preferred view of the law — all of which we are forbidden from doing under § 2254.
I respectfully dissent.
I
A
Let’s begin by restating the relevant facts.
After he was identified as the potential driver in a gang-related shooting that injured two teenagers and killed a third, Kevin Jones, Jr. was brought in for questioning by the Los Angeles Police Department. LAPD Detectives Kevin Jolivette and Bill Fallon proceeded to interview Jones for a period of a few hours, beginning shortly after midnight on August 16, 2003. After being informed of his constitutional rights, Jones spoke willingly with the detectives. Throughout the interview, the detectives employed a ruse against Jones, telling him that both eye witnesses and security-camera footage identified his car as having been involved in the drive-by shooting. The officers pressed Jones on both his and his car’s whereabouts the night of the shooting, and they urged him to admit his involvement in the crime.
Jones spoke at length with the detectives, and as the majority recounts, his story changed considerably throughout the course of the interview. After extensive interrogation, Jones clung to the assertion that on the evening of the crime, his car had gone missing for several hours, even though he admitted that no one other than him used the car. Jones insisted that he had noticed his car missing from its parking space that evening, but for various reasons, he thought little of it and simply assumed that the car would be returned to him. Rather than investigate where his car had been taken, Jones stated that he went to a nearby gym for a couple hours and— as luck would have it — when he returned home, his car was back.
The detectives pressed Jones on the implausibility of this story, leading eventually to the following exchange:
JOLIVETTE: Kevin, do you think — why don’t you stop this man.
JONES: All right.
JOLIVETTE: Stop this. The thing is you drove a car, it shows that on the tape, and that’s all I’m going to put down, as far as what you were doing. You drove the car. You just didn’t know it was going to happen like that. Kevin, sit up, pian.
JONES: I don’t want to talk no more, man.
JOLIVETTE: I understand that, but the bottom line is—
JONES: You don’t want to hear what I’m telling you.
JOLIVETTE: I’m so sorry. I can’t— you’re mumbling, you got to speak up. I got bad hearing.
JONES: I’m telling you all.
At that point, the questioning proceeded as it had for hours, and in short order Jones admitted to driving the car during the shooting. He professed innocence, however, insisting that a stranger had jumped into his car, ordered him to drive to the scene of the shooting, and then jumped out of the car, firing a gun at the victims. A *1144 few days ’later, police interviewed Jones again, and he again insisted on this latest version of his story.
B
Jones was prosecuted largely on the strength of his incriminating statements and was found guilty by a jury of first degree murder, two counts of attempted murder, and other lesser crimes. Jones was sentenced to 75 years to life.
Jones appealed to the California Court of Appeal, arguing, among other things, that his incriminating statements should not have been introduced at trial, because they were obtained in violation of his Fifth Amendment right to silence. The California Court of Appeal disagreed, concluding that Jones’s statement that he did not “want to talk no more” was ambiguous in context and it thus did not require police to end his interrogation. Jones filed a petition for review challenging this conclusion with the California Supreme Court, which the court denied without comment.
Jones then filed a federal habeas petition under 28 U.S.C. § 2254, which was denied by the district court. Jones timely appealed.
II
Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may grant relief only if the California Court of Appeal’s[1] rejection of Jones’s right-to-silence claim “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. §§ 2254(d)(1)—(2). Time and again, the Supreme Court has reminded federal courts — and ours in particular — that this standard is “difficult to meet” and “highly deferential,” which “demands that state-court decisions be given the benefit of the doubt.” Pinholster, 563 U.S. at 181, 131 S.Ct. 1388 (quoting Harrington v. Richter, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)).
A decision is “contrary to” clearly established law where the state court “applies a rule that contradicts the governing law set forth in [Supreme Court] cases” or where it “confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from” the Court. Mitchell v. Esparza, 540 U.S. 12, 15-16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court unreasonably applies clearly established federal law only if its determination “was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.” Richter, 562 U.S. at 103, 131 S.Ct. 770. “[A]n unreasonable application of federal law is different from an incorrect application of federal law.” Id. at 101, 131 S.Ct. 770 (quoting Williams, 529 U.S. at 410, 120 S.Ct. 1495). “A state court’s determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court’s decision.” Id. (internal quotation marks omitted).
*1145 A state-court decision “will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.” Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (emphasis added). “While not impossible to meet, that is a daunting standard — one that will be satisfied in relatively few cases, especially because we must be particularly deferential to our state-court colleagues.” Hernandez v. Holland, 750 F.3d 843, 857 (9th Cir. 2014) (internal quotation marks omitted). Thus, a “state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.” Wood v. Allen, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010).
Ill
All parties agree on the foundational principle underlying this case: a suspect who seeks to invoke his Fifth Amendment right to silence must do so unambiguously. See Thompkins, 560 U.S. at 381-82, 130 S.Ct. 2250. Once he does, the suspect’s right to cut off questioning must be “scrupulously honored,” Michigan v. Mosley, 423 U.S. 96, 103-04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (internal quotation marks omitted), and the “interrogation must cease,” Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). But interrogating officers have no duty to heed a request that — either on its face or in context — is “ambiguous or equivocal.” Thompkins, 560 U.S. at 381-82, 130 S.Ct. 2250.
The California Court of Appeal correctly acknowledged this rule, and determined that, in context, Jones did not unambiguously invoke his right to silence. The court explained that immediately after Jones said he did not “want to talk no more,” he continued, “You don’t want to hear what I’m telling you.” The court opined that, “in context, considering his willingness to talk with the detectives before and after that point in the interview,” Jones was not “unambiguously invoking his right to remain silent,” but instead was “expressing frustration with the detectives’ refusal to believe him.”
There is little doubt that this factual conclusion — that, in the full context of Jones’s interrogation, any invocation of his right to silence was ambiguous — is reasonable on the record before us. When strung together, Jones’s statements quite reasonably read as the state court portrayed them: not as a request for silence but as an expression of frustration by a person who wished the police would believe his story. In the pivotal exchange, Jones’s thoughts appear scattered and he seems upset, cutting off Detective Jolivette mid-sentence. Further, neither before nor after this exchange did Jones even obliquely mention a desire for silence. Indeed, for all but one isolated statement, Jones seemed perfectly willing to engage the detectives. In context, it is not unreasonable to interpret that singular, stand-out statement as something other than a clear invocation of the right to remain silent. Under AEDPA, that factual conclusion therefore must stand, unless it was based on an unreasonable misapprehension of clearly established law. See Wood, 558 U.S. at 301-04, 130 S.Ct. 841; Miller-El, 537 U.S. at 340, 123 S.Ct. 1029.
The majority does not seriously contest this conclusion, but instead asserts that clearly established law prohibited the state court from considering this full factual context when evaluating the clarity of Jones’s statement. Specifically, the majority holds that the state court could not find Jones’s statement ambiguous based on anything Jones said after the precise moment he uttered, “I don’t want to talk no more, man.” See Maj. Op. at 1132-33, 1136-37. *1146 But the majority has failed to identify any ease — alone or in combination with other cases — that clearly establishes anything of the sort.
A
The majority’s assertion that ambiguity can never be provided by words a suspect says after he supposedly invokes his right to silence stems, at bottom, from a single Supreme Court case: Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (per curiam). But the Court’s opinion in Smith has no bearing on the ease before us and, in any event, does not stand for the remarkable proposition the majority attributes to it.
1
First, and most simply, at the time the state court issued its decision, Smith — a case examining the right to counsel — could not provide clearly established law for Jones’s right-to-silence claim. In Miranda v. Arizona, the Supreme Court held that, during an interrogation, police must inform a suspect of both rights — his right to remain silent and his right to have an attorney present — and that they must cease all Questioning upon the suspect’s invocation of either right. 384 U.S. at 471-74, 86 S.Ct. 1602. But, until last December, we had refused to treat cases defining the standards for invoking one right (e.g., the right to counsel) as clearly established law governing the standards for invoking the other right (e.g., the right to silence). See Garcia v. Long, 808 F.3d 771, 777 n. 1 (9th Cir. 2015); Anderson v. Terhune, 516 F.3d 781, 787 n. 3 (9th Cir. 2008) (en banc); see also Bui v. DiPaolo, 170 F.3d 232, 239 (1st Cir. 1999) (right-to-counsel precedent did not “authoritatively answer” question in a right-to-silence case, even though the Supreme Court “likely would” apply the same standard to both rights (internal quotation marks omitted)).
We recently changed our interpretation only because of intervening Supreme Court precedent. In 2010, the Supreme Court considered whether past decisions that required an invocation of the right to counsel to be unambiguous applied equally to a suspect who sought to invoke his right to silence. In Berghuis v. Thompkins, the Court held that the same standards indeed do apply, explaining that it saw “no principled reason to adopt different standards for determining when” either right had been invoked. 560 U.S. at 381, 130 S.Ct. 2250. Accordingly, we recently held that, after Thompkins, right-to-counsel precedent now may indeed provide clearly established law in right-to-silence cases — despite our past practice to the contrary. Garcia, 808 F.3d at 777 n. 1.
But, critically, this development in the law occurred after both the California Court of Appeal and the California Supreme Court issued their decisions on Jones’s claim (in 2008). Under AEDPA, we may grant relief only if the state court’s decision is irreconcilable with the law as clearly established by the Supreme Court at the time the state court acted. Greene v. Fisher, — U.S. -, 132 S.Ct. 38, 44-45, 181 L.Ed.2d 336 (2011); Pinholster, 563 U.S. at 182, 131 S.Ct. 1388. Before Thompkins, it was anything but clear that right-to-counsel cases governed right-to-silence claims. That very question was at the heart of the Supreme Court’s grant of certiorari in Thompkins. See Thompkins, 560 U.S. at 381, 130 S.Ct. 2250. Even if one agrees with the Court’s affirmative answer to that question, the point is that the answer had never been given until Thompkins. See id.; see also Anderson, 516 F.3d at 799 (Tallman, J., dissenting) (“The United States Supreme Court has never declared its right to counsel principles applicable to invoking the right to silence, and under AEDPA that precedent was not ‘clearly established’ when the California *1147 Court of Appeal rendered its decision.”). Acting before Thompkins, the state court cannot possibly have failed reasonably to apply Smith’s right-to-eounsel holding to Jones’s right-to-silence claim. Indeed, before Thompkins, not even our court would have evaluated Jones’s claim under Smith. See Garcia, 808 F.3d at 777 n. 1. Accordingly, any supposed error related to Smith cannot be a basis for upsetting the decision of the California Court of Appeal.
2
Second, even if Smith did govern Jones’s right-to-silence claim, that case does not remotely stand for the sweeping propositions the majority attributes to it. Jones’s case is nothing at all like Smith, and the state court’s refusal to extend Smith to Jones’s situation is patently reasonable. In short, even on its merits, Smith provides no basis on which to grant relief in this case.
a
In Smith, at the outset of police questioning, the suspect (Smith) stated that an unidentified woman told him to get an attorney. 469 U.S. at 92, 105 S.Ct. 490. Shortly thereafter, when asked whether he understood his right to have an attorney present, Smith responded, “Uh, yeah. I’d like to do that.” Id. at 93, 105 S.Ct. 490. Rather than stop so that Smith could contact an attorney, the officers continued to read his rights, and “then pressed him again to answer their questions.” Id. After a somewhat confused back-and-forth about his right to an attorney, Smith ultimately agreed to speak without a lawyer present. Id. On review before the Supreme Court, Smith argued that all questioning should have ceased the moment he requested an attorney the first time. The State countered that it was unclear to the officers whether Smith actually wanted an attorney given that he agreed to proceed without one after further questioning.
The Supreme Court rejected the State’s argument, and explained that once an unambiguous request for counsel has been made, “an accused’s postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.” Id. at 100, 105 S.Ct. 490 (emphasis omitted). This rule was needed to prevent officers from “badgering or overreaching” to “wear down the accused and persuade him to incriminate himself not withstanding his earlier request for counsel’s assistance.” Id. at 98, 105 S.Ct. 490 (internal quotation marks and alterations omitted). But questioning need not end where the accused’s request “may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself.” Id. at 99-100, 105 S.Ct. 490.
The rule of Smith is thus: once a suspect clearly invokes his right to counsel, officers may not continue to question him and use his answers to those questions to cast retrospective doubt on the clarity of his initial invocation. That is, ambiguity cannot be retroactively manufactured through the suspect’s “postrequest responses to further interrogation.” Id. at 100, 105 S.Ct. 490 (emphasis added). But Jones’s critical statement — the utterance that the state court reasonably determined cast doubt on what Jones meant by “I don’t want to talk no more” — was not a response to further interrogation. Despite the majority’s many assertions to the contrary, Maj. Op. at 1132, 1137, 1140-41, the police did not ask Jones a single question between his two statements. They did not continue “interrogating” him at all. Indeed, Detective Jo-livette did not even get out a complete sentence — it is anyone’s guess what that sentence was going to be — before Jones cut him off to say, “You don’t want to hear what I’m telling you.” Jolivette’s next comment was just to ask Jones to speak louder *1148 because he was having trouble hearing him. Jones then said, “I’m telling you all.” Only then — at which point an officer quite reasonably may have been confused as to whether Jones was seeking to remain silent — did questioning continue. Jones never again hinted at a desire for silence.
This is nothing at all like the situation in Smith, where officers spoke to and questioned the suspect at length after he requested an attorney. In Smith, the State contended that the suspect’s earlier request was unclear based only on his “responses to continued police questioning.” 469 U.S. at 97, 105 S.Ct. 490 (emphasis added). By contrast, the officers here asked Jones nothing, they did not continue interrogating him, and they certainly did not manufacture ambiguity by badgering Jones or wearing him down. See id. at 98, 105 S.Ct. 490. Instead, Jones’s statement was ambiguous immediately, as confirmed by comments he made directly afterward. While those comments came later in time (barely), they were not the product of any “further interrogation” whatsoever. This situation is patently — and certainly reasonably — distinguishable from that in Smith.
If the limitations of Smith were not already obvious on the face of the Court’s analysis, the Court took additional care to emphasize that its “decision [was] a narrow one.” Id. at 99, 105 S.Ct. 490. That narrow decision did “not decide the circumstances in which an accused’s request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself.” Id. at 99-100, 105 S.Ct. 490. And Smith certainly does not preclude the California courts from determining that Jones’s situation presents just such a circumstance where the suspect’s “request itself’ was ambiguous. Even if on de novo review the majority would reach a different result, the majority’s preferred interpretation is certainly not “beyond any possibility for fairminded disagreement.” Richter, 562 U.S. at 103, 131 S.Ct. 770.
b
The majority holds to the contrary only by misattributing to Smith a sweeping rule that case in no way embraced. The majority suggests that Smith’s prohibition against creating ambiguity on the basis of “postrequest responses to further interrogation” actually means that the police must disregard anything the suspect happens to say at a moment in time after he has arguably invoked his right to silence. See Maj. Op. at 1132-33, 1140-41. That is, even though context may render an otherwise apparently clear statement ambiguous, the majority concludes that such context can never be supplied by something the suspect says after his supposed request for silence.
The majority’s reading not only stretches Smith to its breaking point, but it creates a rule that defies the basic logic of human interaction and which would have sweeping consequences for police officers. Consider, for example, a situation in which there is no interruption by a police officer at all. Suppose that during an interrogation a suspect said, “Man, I don’t even want to talk about this anymore.” Then, after an uninterrupted pause, he continued, “This is so frustrating. I’m answering all your questions, but you won’t believe what I’m saying.” Must an officer plug his ears and ignore the latter two sentences, merely because they came after the first sentence? Of course not. Smith does not compel such a result, and anyone who has ever held a conversation would naturally reject it. Indeed, albeit in an unpublished disposition, another panel of our court recently held that Smith allows officers to take into account the totality of just such a sequence. In United States v. Winsor, a suspect stated, “I think I’d like an attorney,” which after *1149 a “couple moments of silence,” he followed with, “Shouldn’t I have an attorney here?” 549 Fed.Appx. 630, 633 (9th Cir. 2013) (mem.) (internal quotation marks omitted). Our court held that the suspect’s two sentences — which the police did not attempt to “engineer” — should be read together as a single statement that, as a whole, was not an unambiguous request for counsel. Id. Precedential or not, that decision certainly reflects a reasonable interpretation of Smith, which, again, is the low bar the State must clear.
And if Smith would allow an officer to consider two separate but uninterrupted sentences together as a single statement, we are left with a simple question: does Smith mandate a different result merely because an officer manages to eke out half a thought between the suspect’s two sentences? As explained above, plainly not. Smith spoke of “responses to further interrogation” and was concerned with ambiguity manufactured through repeated questioning and badgering. It says nothing for where, as here, an officer merely says something — but does not interrogate, question, or badger — before the suspect continues talking.
The majority complains that such an interpretation of Smith somehow obscures the “bright-line” prohibition against continuing to interrogate a suspect after he has clearly invoked his right to silence. See Maj. Op. at 1139 n. 2. The majority claims that this interpretation would “create a gray area about how much [continued] interrogation is interrogation enough,” and would allow officers to continue asking a suspect “some threshold number of questions.” Id. Not so. I must emphasize once again: the police asked no questions between Jones’s critical statements. The only “threshold number of questions” needed to distinguish this case from Smith is the simplest threshold of all: zero. If Jones had been forced to respond to even a single question — that is, if the police had continued to interrogate him at all — perhaps that would raise more difficult considerations regarding the precise limits of the rule set' in Smith. Fortunately, in this case we need to recognize only that what Smith prohibits is “continued police questioning,” 469 U.S. at 97, 105 S.Ct. 490, and “further interrogation,” id. at 100, 105 S.Ct. 490— neither of which happened here.
At best, the majority’s expansive rule represents an extension of Smith to a situation not contemplated by the Court in that case. Regardless how much the majority might prefer such an extension, that is not cause for relief under AEDPA. See White v. Woodall, — U.S. -, 134 S.Ct. 1697, 1706, 188 L.Ed.2d 698 (2014) (“[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.” (internal quotation marks omitted)). Fundamentally, the question before us is not whether the majority’s expansive reading of Smith is correct or incorrect; the only question we may consider is whether the state court could reasonably interpret Smith more narrowly so as to distinguish it from the situation before us. Quite obviously it could.[2]
*1150 B
Despite superficial attempts to do so, the majority cites no case that bridges the analytical gaps left unfilled by Smith.
The majority asserts that Miranda v. Arizona itself clearly established that the police could not take into account anything Jones uttered after he said that he did not “want to talk no more.” See Maj. Op. at 1132, 1136-37. Cherry-picking quotations from Miranda, the majority argues that because Jones indicated “in any manner” that he wished for silence, the police were required to stop speaking to him. See Maj. Op. at 1136-37, 1141 (quoting Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602). But, despite the majority’s selective quotations, it is decidedly not the law that police must cease speaking — or even questioning— once a suspect indicates that he wishes for silence “in any manner.” Rather, the manner in which the suspect requests silence must be unambiguous; an “ambiguous or equivocal” request will not do. Thompkins, 560 U.S. at 381-82, 130 S.Ct. 2250. Thus, at least as subsequently clarified by the Supreme Court, Miranda would better be described to hold that questioning must stop whenever a suspect requests silence “in any [unambiguous] manner.” Despite its best efforts not to,[3] the majority con *1151 cedes as much. See Maj. Op. at 1139 n. 2 (“[Miranda and Smith] stand for the simple proposition that officers must stop questioning a suspect once he unambiguously invokes his right to silence.... ” (emphasis added)). But that simply returns us to the same question we started with: what does it mean for a statement to be unambiguous, and what sort of factual context may an officer consider when inter-: preting the clarity of a statement? On these questions, Miranda provides no guidance at all.
Completely beside the point, the majority makes much of the Supreme Court’s commands in Miranda and in Michigan v. Mosley that a valid request for silence must be “scrupulously honored.” See Maj. Op. at 1137, 1141. It is true that Miranda and Mosley state unequivocally that police questioning must cease once the right to silence is invoked. But that command simply instructs officers how to behave once the right to silence has been unambiguously invoked. This case is about whether the right was ever unambiguously invoked, or more accurately, whether the state court reasonably determined that any invocation was ambiguous in context. Neither Miranda nor Mosley speak to that question.[4]
Finally, the majority reverts to what is becoming an old habit of our court: citing federal circuit court cases to help bolster an attempt to extend Supreme Court precedent under federal habeas review. See Maj. Op. at 1137, 1139, 1140-41, 1142 (citing Garcia, 808 F.3d at 771; Anderson, 516 F.3d at 781; United States v. Lafferty, 503 F.3d 293 (3d Cir. 2007)). This we plainly cannot do. See Glebe v. Frost, — U.S. -, 135 S.Ct. 429, 431, 190 L.Ed.2d 317 (2014) (per curiam); Lopez v. Smith, — U.S. -, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam); Marshall v. Rodgers, — U.S. -, 133 S.Ct. 1446, 1450-51, 185 L.Ed.2d 540 (2013) (per curiam). And even more, just like the majority’s chosen Supreme Court cases, none of the Court of Appeals cases-cited by the majority actually holds that a court can never infer ambiguity on the basis of statements made after a supposedly clear request for silence.[5] Even if these cases were relevant under AEDPA review, they would not get the majority to its preferred destination.
In sum, the majority’s rejection of the factual context provided by Jones’s complete statements stems from an overly broad reading of Smith that is unsupport *1152 ed by reference to Miranda, Mosley, or any other case cited in the majority’s opinion. Under AEDPA, the State court cannot be faulted for failing to anticipate the majority’s de novo extension of the law.
IV
In this case, the California Court of Appeal: (1) identified the correct legal rule applicable to Jones’s right-to-silence claim, (2) reasonably interpreted the facts underlying Jones’s claim, and (3) reasonably applied that legal rule to those facts in rejecting the claim. The majority does not identify a single case — let alone a relevant Supreme Court case — that holds to the contrary or that even contemplates the situation in which Jones’s claim arose. Instead, the majority essentially concludes that Supreme Court precedent ought to extend farther than it currently does, and — as has unfortunately become routine for our court — chastises the state court for failing to predict and to adhere to the majority’s preferred view of the law.
Because AEDPA prohibits federal courts from doing exactly that, I respectfully dissent.

. Because the California Supreme Court summarily denied review, we look through that denial to the reasoning given by the California Court of Appeal when it denied Jones’s claim. See Cannedy v. Adams, 706 F.3d 1148, 1158 (9th Cir. 2013), amended on denial of reh'g, 733 F.3d 794 (9th Cir. 2013).

. Further, given the limitations of the record before us, I fail to see how we could possibly conclude that it is unreasonable to characterize Jones's comments as one continuous statement. We do not have the benefit of an audio recording, and thus we are left to guess just how rapid the exchange between Jones and Jolivette was. As the author of today’s opinion suggested at oral argument, one quite reasonable interpretation of our limited record is that Jones and Jolivette spoke so quickly that they were “stepping on each other’s lines.’’ That is, perhaps the exchange was so rapid that Jones’s two statements came out "as almost one sentence that has a little interruption in there.”
Of course, the transcript could be read in a way to make this a more difficult case for the *1150 government — for example if we infer a dramatic pause between when Jones and Joli-vette spoke. But, once again, under AEDPA we are not asked to determine what the best reading of the record is (and certainly not what reading is most favorable to Jones). We are tasked only with determining whether the state court's view of the exchange was reasonable. It was.

. The majority at times seems to suggest that our analysis should ignore the Supreme Court's holding in Thompkins that a suspect’s request for silence must be unambiguous. See Maj. Op. at 1139-40, 1140 n. 3. The majority argues that, if AEDPA prevents Jones from basing his claim on anything the Court wrote in Thompkins, see supra Part III.A.l, then the government must likewise ignore any aspect of Thompkins that confirms the correctness of the state court’s decision. See Maj. Op. at 1140 n. 3. But we have every reason to treat the parties differently in this respect, and the majority’s argument to the contrary would turn AEDPA on its head.
AEDPA prohibits us from granting relief unless the state court unreasonably applied federal law as clearly established at the time the state court acted. See Greene, 132 S.Ct. at 44-45. Thus, Jones cannot receive relief based on anything in Thompkins, because Thompkins came after the state court’s decision in this case. See supra Part III.A.l. The government, on the other hand, is asked only to show that the state court’s decision was reasonable. To do that, the government has no need to rely on Thompkins at all. Before Thompkins, we had held that it was at least reasonable for a court to conclude that a request for silence must be unambiguous, even if the Supreme Court had not clearly established as much. See DeWeaver v. Runnels, 556 F.3d 995, 1001-02 (9th Cir. 2009). Thus, in many ways, Thompkins is beside the point for the government in this case.
But, even if reference to Thompkins is not necessary to conclude that the state court’s decision was reasonable, we may of course cite Thompkins to underscore that conclusion. It would be the very antithesis of deference for us to ignore the fact that state court’s conclusion about ambiguity was later held by the Supreme Court to be correct. Given the standard of review erected by AEDPA, there is no contradiction in allowing the government to rely on a case even when Jones may not. Cf. Lockhart v. Fretwell, 506 U.S. 364, 372-73, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (state may take benefit of new rules on collateral review even though petitioner may not).
Finally, I must observe that the majority and I have referenced Thompkins for two very different reasons. I cite Thompkins merely to confirm that the state court was right to conclude that Jones's request for silence needed to be unambiguous. The majority, however, seeks to use Thompkins to sustain its otherwise unsupportable assertion that the state court was compelled to follow all of the Supreme Court’s prior cases discussing ambiguity in the right-to-counsel context. See Maj. Op. at 1140 n. 3. Again, before Thompkins, the Supreme Court had never held that right-to-silence invocations are governed by the same standards as right-to-counsel invocations. Even if the state court determined that both invocations need to be “unambiguous,” it was *1151 by no means compelled also to conclude that the standards governing ambiguity must be the same in both contexts. As the majority itself points out, Maj. Op. at 1137-38, there could reasonably be different standards that govern each right (even if that argument is now foreclosed by Thompkins).

. In the same vein, the majority discusses standards for evaluating a claim of waiver after the right to counsel has been invoked, as developed by the Supreme Court in cases such as Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). See Maj. Op. at 1145-47. Again, the case before us is strictly about whether Jones ever invoked his right to-silence unambiguously; it has nothing to do with how we determine waiver after such an invocation has occurred.

. Of the Court of Appeals cases, the majority relies most heavily on our en banc decision in Anderson v. Terhune, a case inapposite on its facts. There, officers ignored a suspect’s "clear and repeated invocations of his right to remain silent” by feigning not to understand what he meant. See 516 F.3d at 785-86. Under AEDPA, we held that Miranda does not allow officers to "manufacturen [ambiguity] by straining to raise a question regarding the intended scope of a facially unambiguous invocation of the right to silence.” Id. at 787. This case says nothing for how a court must interpret a one-time statement rendered ambiguous nearly immediately afterward — and before police officers can even complete another sentence.