**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEVIN JONES, JR.,
*Petitioner-Appellant*,

v.

K. HARRINGTON,
*Respondent-Appellee.*

No. 13-56360

D.C. No.
2:10-cv-05071-GW-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted August 31, 2015
Pasadena, California

Filed July 22, 2016

Before: Alex Kozinski, Diarmuid F. O'Scannlain,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge O'Scannlain

**SUMMARY***


**Habeas Corpus**

The panel reversed the district court's judgment denying California state prisoner Kevin Jones's habeas corpus petition challenging his murder conviction, and remanded with instructions to grant the writ, in a case in which Jones, after hours of police questioning with little progress, told the officers "I don't want to talk no more."

The panel held that any reasonable jurist would have to conclude that when Jones said he did not want to talk "no more," he meant it, and that by continuing to interrogate Jones after his invocation of his right to remain silent, the officers squarely violated *Miranda v. Arizona*. The panel wrote that the government cannot use against Jones anything he said after his invocation, and held that allowing the state to use his post-invocation statements against him, even to argue that his initial invocation was ambiguous, is contrary to clearly established Supreme Court case law.

Dissenting, Judge O'Scannlain wrote that whether one believes that the California courts' determination that Jones's statement was not unambiguous when considered in full context to be correct or not, that determination rests on a reasonable application of clearly established Supreme Court law to the facts of the case and must therefore stand under the deferential standard of review.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kathryn A. Young (argued), Deputy Federal Public Defender; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

David Glassman (argued), Stephanie A. Miyoshi, and Ana R. Duarte, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Kamala D. Harris, Attorney General of California; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

# OPINION

BYBEE, Circuit Judge:

The Los Angeles Police Department suspected that defendant Kevin Jones was involved in a gang shooting that left one person dead and two injured. Detectives picked Jones up and began interrogating him. After hours of questioning, and little progress, Jones finally told the officers "I don't want to talk no more." Undeterred, the officers continued questioning Jones, and eventually, he made a number of incriminating statements. Jones's statements were the lynchpin of the state's prosecution against him—and Jones was convicted and sentenced to seventy-five years to life.

On direct appeal, Jones contended that officers were wrong to continue to interrogate him after he invoked his right to remain silent, and that his incriminating statements should not have been used against him. The California Court of Appeal held that Jones did not unambiguously invoke his right to remain silent, so no suppression was warranted. It reasoned that after officers continued to interrogate Jones with only a single follow-up question, he continued to talk and made statements that cast some doubt on whether he had actually invoked his right to remain silent.

But the Supreme Court has been clear on this point: When a suspect invokes his right to silence, the officers' interrogation must cease. Period. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). By continuing to interrogate Jones after his invocation, the officers squarely violated *Miranda.* That means the government cannot use against Jones anything he said after his invocation. And that includes using

Jones's subsequent statements to "cast retrospective doubt on the clarity of [his] initial request itself." *Smith v. Illinois*, 469 U.S. 91, 98–99 (1984) (per curiam)*; see Davis v. United States*, 512 U.S. 452, 458 (1994); *Miranda*, 384 U.S. at 444. Allowing the state to use Jones's post-invocation statements against him, even to argue that his initial invocation was ambiguous, is thus contrary to clearly established Supreme Court case law. Once Jones said he wished to remain silent, even one question was one question too many.

We hold that any reasonable jurist would have to conclude that when Jones said he did not want to talk "no more," he meant it. The Court of Appeal's decision is both contrary to and an unreasonable application of clearly established Supreme Court law, and it is based on an unreasonable determination of the facts. Further, given the pivotal role Jones's statements played at trial, the trial court's error was not harmless. We reverse the judgment of the district court and remand with instructions to grant the writ.

I

A. *The Shooting*

In August of 2003, three teenagers—members of the Eight Treys Gangster Crips—were stopped at a gas station that bordered the territory of neighboring rival gang Westside Rolling 90s Crips. A black Ford pulled up to the teens. An African-American male wearing a Cleveland Indians cap leaned out the passenger window and shouted, "F— [Eight Treys]. This is Westside Rolling Crips." The Ford then drove off.

The three teenagers finished pumping their gas, and pulled out of the gas station into the intersection. Moments later, the black car reappeared on their right side. The driver of the black car, a "[l]ight skinned" African-American, made a Rolling 90s gang sign, and then turned and said something to his passenger. The passenger lifted himself onto the window frame of his door. He leveled a semi-automatic weapon at the teens, and opened fire. Two of the teens were struck, along with a third person who was driving nearby. One of the teens died from his wounds later that night.

On August 15, 2003, police officers stopped Jones, who was driving his black two-door Ford Escort. The officers had previously received a tip from an informant that Jones was a member of the Rolling 90s who drove a car like the one identified in the shootings. The police found a Cleveland Indians cap in Jones's car, and after impounding the car, matched fingerprints on the outside door to a person who belonged to a gang affiliated with the Rolling 90s. Police brought Jones in for questioning that night.

B. *The Interrogation*

Jones was brought to the police station some time between 9:00 and 9:40 p.m. He was read his *Miranda* rights and interviewed later that night, beginning at 12:33 a.m., by Detectives Kevin Jolivette and Bill Fallon. Jones was nineteen years old, had graduated from technical school, and worked full-time for UPS. The interview lasted between two and three hours.

At the outset of the interview, Jones told the detectives that he owned his black Ford Escort, and that no one else drove it. He initially insisted that he had no knowledge of the

shooting, and that on the day in question he had driven straight home after finishing work.

The detectives lied to Jones, telling him they had incriminating evidence which did not actually exist. The detectives told Jones that witnesses had identified his car as the one used in the shooting and that the car appeared on surveillance video from the gas station. The detectives held consistently to the ruse, insisting to Jones that they already knew he and his car were involved with the shooting, and implored him to come clean about his role. The police told Jones that he would receive more lenient punishment if he admitted to being only the driver rather than the shooter or the person whose idea the shooting was.

Over the course of the interview, Jones's story changed several times. First, he told the police that he had no personal knowledge of the shooting, and gave a somewhat inconsistent story about how he learned of the shooting from a barber on the street while driving home a few days after the shooting. Jones stated that, on the day of the shooting, he came straight home from work, parked his car at his house around 5:00 p.m. or 5:30 p.m., and then walked to the gym. He stated that around 6:45 he noticed his car was missing, but assumed it would be returned, and went to the gym anyway. His explanations for why he assumed the car would be returned changed somewhat, but he said that by the time he got home from the gym, the car was back. As detectives continued to press Jones about his implausible story, the following exchange occurred:

> Jolivette: Kevin, do you think – why don't you stop this man.

Jones: All right.

Jolivette: Stop this. The thing is you drove a car, it shows that on the tape and that's all I'm going to put down, as far as what you were doing. You drove the car. You just didn't know it was going to happen like that. Kevin, sit up, man.

Jones: *I don't want to talk no more, man.*

Jolivette: I understand that, but the bottom line is –

Jones: You don't want to hear what I'm telling you.

Jolivette: I'm so sorry. I can't – you're mumbling, you got to speak up. I got bad hearing.

Jones: I'm telling you all.

From there, questioning continued as normal, and eventually Jones made incriminating statements. Most importantly, he admitted to driving the car during the shooting. He claimed that a stranger with a gun jumped into his car, ordered him to drive to the gas station, yelled at the teenagers, and then hopped out of his car at the intersection and began shooting.

Officers arrested Jones a few days later and interviewed him again. The detectives pressed him on the implausibility of his earlier statements about driving a stranger to the shooting, but Jones again stated that was what happened.

## C. *The Trial*

The case against Jones revolved around the statements he made during the police interrogations. In her closing argument, the prosecutor explained there were no witnesses: "From the beginning, I had told you that there have been no identifications of Mr. Jones. None of the surviving victims were able to pick him out of the photographic lineup. None of them came into court and ID'd Mr. Jones." No physical evidence connected Jones to the shooting. Indeed, witness testimony cut in favor of Jones's case: Witnesses stated that the car involved in the shooting was different than Jones's car, and Jones's baseball cap was different from the one witnesses described.

Instead, the government relied on Jones's statements. During her opening statement, the prosecutor told the jury that "you're going to hear Jones' own words which convict him . . . of being the driver in this case." The prosecutor concluded "Through all of these lies, you will have his admission that he drove in the shooting." During closing arguments the prosecutor again relied heavily on Jones's statements:

> So what do you have? You have Mr. Jones by his own words identifying himself as the driver in this shooting . . . [H]e tells you he was the driver in the shooting. And that's it. That's all you need. That's evidence beyond a reasonable doubt that he is the driver in the shooting . . . Once you review those tapes, if you believe those tapes, that's the end of the inquiry for Mr. Jones. . . . So when you look through Jone['s] taped statements, his words

convicting himself as the driver in the shooting is all that you need. That is proof beyond a reasonable doubt.

The jury convicted Jones of first degree murder, two counts of attempted murder, two counts of shooting at an occupied motor vehicle, and assault with a firearm. The trial court sentenced Jones to five years, plus 75 years to life.

D.  *Post-Trial Review*

Jones appealed to the California Court of Appeal. The court affirmed his conviction in an unpublished decision. It ruled on Jones's *Miranda* argument in a single paragraph, reasoning that Jones's statement that he did not "want to talk no more" was ambiguous in light of the statements he made after:

At a single point, midway through the first interview, appellant said, "I don't want to talk no more, man.'  His next sentence, however, was, 'You don't want to hear what I'm telling you." Taken in context, considering [Jones's] willingness to talk with the detectives before and after that point in the interview, [Jones] was expressing frustration with the detectives' refusal to believe him, rather than unambiguously invoking his right to remain silent.

The court thus relied on the fact that Jones's next sentence after saying he did not want to talk—made in response to officers continuing to question him—made his initial invocation ambiguous. Jones filed a petition for review with

the California Supreme Court, which was denied without comment.

Jones then filed a federal habeas petition. The magistrate judge filed a Final Report and Recommendation—a report summarily adopted by the district judge—recommending denial of Jones's petition. Because the district judge adopted the magistrate judge's report, we look to this report as the decision. But curiously, in granting the certificate of appealability, the district judge's analysis suggested that the State violated *Miranda* here. The district judge observed that Jones's statement was a "seemingly unambiguous" invocation of his right to remain silent. "Petitioner said, 'I don't want to talk no more, man.' Aside from mentioning *Miranda* by name, what could be clearer?"

Like the California Court of Appeal, the magistrate judge's report held Jones's request was ambiguous in light of the statements he made *after* invoking his right to silence. The court also relied on the fact that Jones did not ask to remain silent again after his initial invocation.

## II

We review the district court's denial of a habeas petition de novo. *Hebner v. McGrath*, 543 F.3d 1133, 1136 (9th Cir. 2008). The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Jones's petition. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). We may grant the petition only if the state court's adjudication of Jones's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A decision is "contrary to" Supreme Court precedent where "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). We may not grant habeas relief unless the state court's determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410 (emphasis removed). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (internal quotation marks omitted). The standard is meant to be "difficult to meet." *Id.* at 102.

Similarly, the standard for finding that a state court made an unreasonable determination of the facts is "daunting," and "will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). But we can "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Maxwell v. Roe*, 628 F.3d 486, 503 (9th Cir. 2010). And where the state court makes factual findings "under a misapprehension as to the correct legal standard," "the resulting factual determination will be unreasonable and no presumption of correctness can

attach to it." *Taylor*, 366 F.3d at 1001*; see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

In this case, the California Supreme Court summarily denied review.  Looking through to the last reasoned state court decision, the California Court of Appeal's decision will serve as the focus of our analysis.  *See Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir. 2013) *amended on denial of reh'g*, 733 F.3d 794 (9th Cir. 2013).

### III

The California Court of Appeal determined that Jones's statement that he "don't want to talk no more" was made ambiguous by statements he made *later* in the interrogation. As we demonstrate in Part A, this determination was contrary to and an unreasonable application of clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1).  By continuing to interrogate Jones after he had invoked his right to remain silent, officers violated *Miranda*—which means the government cannot use against Jones anything he said after his invocation.  This includes using Jones's subsequent statements to police to "cast retrospective doubt on the clarity of the initial request itself."  *Smith*. 469 U.S. at 100.  "To permit the continuation of custodial interrogation" after Jones's invocation "would clearly frustrate the purposes of *Miranda*."  *Michigan v. Mosley*, 423 U.S. 96, 102 (1975).  To the extent the California Court of Appeal read ambiguity into Jones's invocation—based on statements he made later—that finding was "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).  Because we also conclude in Part B

that the admission of this evidence at trial was prejudicial, we reverse the district court's decision denying the writ.[1]

A. *Violation of clearly established law*

    1. Officers violated *Miranda* by continuing to interrogate Jones after he invoked his right to remain silent

The Supreme Court has made clear that once a person being questioned "indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda*, 384 U.S. at 445. "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries." *Id.* To make sure that we understood this procedure, the Court repeated it: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74. "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474. Once a person has "exercise[d] . . . his option to terminate questioning[,] he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. . . . [T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Mosley*, 423 U.S. at 103–04 (internal quotation marks omitted).

---

[1] Because we reverse on *Miranda* grounds, we need not reach Jones's alternative argument that his statements to police were involuntary. *See Dickerson v. United States*, 530 U.S. 428, 433–34 (2000).

The Supreme Court has left us with no doubt that this prohibition on continued questioning is a "bright-line" rule, "a prophylactic safeguard whose application does not turn on whether coercion in fact was employed." *Id.* at 98, 99 n.8. "[C]onjecture and hair-splitting" is what "the Supreme Court wanted to avoid when it fashioned the bright-line rule in *Miranda*." *Anderson*, 516 F.3d at 790; *cf. Davis*, 512 U.S. at 461 (noting that the benefit of a bright-line rule is the "clarity and ease of application" that "can be applied by officers in the real world . . . without unduly hampering the gathering of information" by forcing them "to make difficult judgment calls" with a "threat of suppression if they guess wrong").

Here, there is no doubt officers violated *Miranda*. Certainly, Jones saying he "did not want to talk no more" qualifies as "indicat[ing] *in any manner* that he does not wish to be interrogated." *Miranda*, 384 U.S. at 445 (emphasis added). And there is no real dispute that officers continued interrogating Jones. Officers knew well that he was invoking his right, but continued to push him for more answers: "I understand that but—." No fairminded jurist could reasonably interpret this statement to be "ceasing" the interrogation. *Id.*

### 2. Jones's invocation was not ambiguous under *Berghuis v. Thompkins*

The Supreme Court recently added another layer to the *Miranda* inquiry: Whether the suspect invoked his right to remain silent *unambiguously*. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). Up until *Thompkins*, the right to remain silent could be invoked in "any manner." *Miranda*, 384 U.S. at 445. On the other hand, the right to counsel could be invoked only "unambiguously." *Thompkins*, 560 U.S. at

381.  In *Thompkins*, the Court clarified that the requirement that the right to counsel be invoked "unambiguously" would now be applied with respect to requests to remain silent.  *Id.* Because we must now apply the rules from right to counsel cases to right to silence cases like Jones's, we first walk through the right to counsel caselaw.

In *Miranda*, the Court held that the right to remain *silent* could be invoked "in any manner" and that the interrogation must then "cease."  *Miranda*, 384 U.S. at 445.  By contrast, with respect to the right to *counsel*, *Miranda* announced a slightly different rule: "If the individual states that he wants an attorney, the interrogation must cease *until an attorney is present*."  384 U.S. at 474 (emphasis added).  The scope of the two rights was thus not coextensive—the Court in *Miranda* was unequivocal on what officers must do when an accused invoked his right to silence; it was not as clear what they had to do when the right to counsel was invoked.

From there the caselaw diverged into two lines: One addressing invocations of the right to silence, the other addressing invocations of the right to counsel.  In *Michigan v. Mosley*, 423 U.S. 96 (1976), with respect to the right to silence, the Court clarified that *Miranda* did not mean that "once a person has indicated a desire to remain silent, questioning may be resumed only when counsel is present," *id.* at 104 n.10, but repeated what *Miranda* had said: the suspect's "right to cut off questioning" must be "fully respected," *id*. at 104.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Court continued to develop the requirements for invocations of the right to counsel.  It held that "when an accused has invoked his right to have counsel present during custodial

interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484 (footnote omitted). This was a change—a strengthening of the accused's rights—in the right to counsel: "*Edwards* established a new test for when . . . waiver would be acceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication." *Solem v. Stumes*, 465 U.S. 638, 646 (1984). *See id.* at 648. This was different than the test for the right to silence, which allowed police to continue questioning after some delay. *Mosley*, 423 U.S. at 118.

Right to counsel cases then addressed the requirement at issue in this case: How we determine that "the suspect [has] unambiguously request[ed] counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). This development in the right to counsel context makes sense. Suspects can invoke their right to remain silent in many ways. They may invoke their right by simply remaining silent, or they may indicate in other ways—including by words—that they do not want to talk with police. By contrast, invoking the right to counsel cannot be accomplished by silence or pantomime, but requires the suspect to articulate specifically that she wants counsel. This line of cases explained that an "ambiguous or equivocal" request for counsel does not require police questioning to end and places no limits on how the interrogation can be used later. *Id.*

But the Court also held that the standard for invoking the right to counsel unambiguously was not a demanding one. A suspect need only invoke his rights "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [such] a request." *Id.* at 459.

He need not specifically reference his constitutional rights, nor need he use any specific terminology. *Id.*

The Court clarified that in determining whether an invocation of the right to counsel is ambiguous, "[u]nder *Miranda* and *Edwards*, . . . an accused's post request responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Smith*, 469 U.S. at 92. Allowing the government to use these post-request statements to "cast retrospective doubt" on prior unambiguous invocations would give officers an incentive to ignore invocations in the hopes that a suspect may be persuaded to talk anyway. *Id.* at 100. "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement . . . ." *Id.* at 99. Construing a person's unambiguous invocation of his Fifth Amendment rights by "looking to [his] subsequent responses to continued police questioning" and whether "considered in total, [his] statements were equivocal" is "unprecedented and untenable." *Id.* at 97 (emphasis removed). Accordingly, "under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." *Id.* at 100.[2]

---

[2] The dissent argues that we have unfairly attributed "sweeping propositions" to *Smith*. But we and the dissent seem to agree on *Smith's* propositions. The dissent characterizes *Smith's* holding as: "[O]nce a suspect clearly invokes his right to counsel, officers may not continue to question him." Dissenting Op. at 36. Indeed, this is the same holding we

Finally, in *Thompkins*, the Court noted it had "not yet stated" whether the rules about ambiguity it had developed in the context of invocations of the right to counsel should also apply in the context of invocations of the right to silence. *Thompkins*, 560 U.S. at 381. The Court held "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel as issue in *Davis*." *Id.* Thus, the Court held that the same "standards" about

---

rely on from *Miranda*: Once an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74. Both cases stand for the simple proposition that officers must stop questioning a suspect once he unambiguously invokes his right to silence—and if they do not—the suspect's statements can no longer be used against him.

But the dissent appears to suggest something quite different. The dissent argues for a standard that would permit officers to ask some threshold number of questions before we find that officers have indeed not "ceased" "interrogating." The dissent makes much out of the fact that "Detective Jolivette did not even get out a complete sentence." Dissenting Op. at 37. The dissent says that this is nothing like *Smith* where the officers interrogated the suspect "at length" after his invocation. But the dissent is suggesting we create a gray area about how much interrogation is interrogation enough. And that is exactly what the Supreme Court told us *not* to do when it made *Miranda* a "bright-line" rule. *Smith*, 469 U.S. at 99 n.8. There can be no serious dispute that officers did not "cease" their interrogation of Jones once he had unambiguously told them he wanted to remain silent. And there the *Miranda* analysis must end.

The dissent also says our decision "would have sweeping consequences for police officers." Dissenting Op. at 38. But this parade of horribles is baseless. The rule governing interrogations is the same after this case as it was before—it comes straight from *Miranda*: If a suspect unambiguously states he wants to remain silent, the officers must stop interrogating. Full stop.

ambiguity it had developed in *Davis* and its progeny should now apply to invocations of the right to silence. *Id.*

The government and the dissent urge us to require that Jones's statements be "unambiguous" in light of *Thompkins*, despite that this case came out long after the California Supreme Court's decision. Dissenting Op. at 26, 31. *Thompkins*'s holding is nominally a new holding, *see id.* at 10–11, but in this context it is a holding in the government's favor because it clarified that invocations of the right to remain silent must also be unambiguous. Under the circumstances, we will apply *Thompkins*'s directive that the same standards for finding ambiguity in the right to counsel context should also apply to finding ambiguity in the right to silence context.

But *Thompkins* does not change much: No fairminded jurist could determine that Jones's invocation was ambiguous. First, Jones's initial request to remain silent was unambiguous on its face, and nothing about the prior context of the statement made it ambiguous or equivocal. Jones stated: "I don't want to talk no more"; in other words, *he did not want to talk anymore. See Garcia v. Long*, 808 F.3d 771, 773–74 (9th Cir. 2015) (holding that a suspect answering "no" to the question "[d]o you wish to talk to me?" was an unambiguous request to remain silent under *Miranda*). Jones did not equivocate by using words such as "maybe" or "might" or "I think." *See Anderson*, 516 F.3d at 788; *cf. Smith*, 469 U.S. at 96–97 (holding that nothing in the statement "Uh, yeah. I'd like to do that" suggested equivocation). Nor did anything Jones did or said leading up to this statement make it ambiguous. During the interrogation leading up to this point, Jones spoke little. Most of the interrogation consisted of detectives repeatedly asking

Jones questions, and Jones giving short, often one-word answers.  In any event, the fact that Jones spoke to officers for a while before invoking his right to remain silent makes no difference.  The California Court of Appeal's decision is simply "contrary to" and "an unreasonable application" of *Miranda.*  28 U.S.C. § 2254(d)(1); *Miranda*, 384 U.S. at 473–74 (holding that the right to remain silent can be invoked "any time prior to or during questioning").

The only statements that could cast any ambiguity on Jones's initial invocation were statements he made after the fact.  Indeed, the California Court of Appeal relied largely on Jones's statement made after officers continued interrogating him, reasoning that because Jones made a follow-up statement after only a single clarifying comment from officers, his initial invocation was ambiguous.  But it was clearly established, when determining whether the invocation of a constitutional right is ambiguous, that the California courts could not look to post-invocation statements to "cast retrospective doubt on the clarity of [Jones's] initial request itself."  *Smith*, 469 U.S. at 98–99.[3]  Officers continued to

---

[3] The dissent argues that *Smith v. Illinois*, 469 U.S. 91 (1984), cannot serve as "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254 (d)(1), because *Smith* rested on *Miranda*'s invocation of the right to counsel, not on *Miranda*'s invocation of the right to silence.  Dissenting Op. at 33–35.  *See Smith*, 469 U.S. at 98-99 (discussing "the request for counsel").  The dissent contends that only recently, in *Thompkins*, did the Supreme Court declare the right to silence should be treated the same as the right to counsel.  According to the dissent, since *Thompkins* post-dates the California decisions in this case, it cannot serve as the "clearly established Federal law" required by AEDPA.  Dissenting Op. at 34.

With respect, we think the dissent is wrong.  The dissenting opinion begins by quoting *Thompkins*.  Dissenting Op. at 26; *see also id.* at 31.

interrogate Jones after he had unambiguously asked to remain silent. When Jones said "I don't want to talk no more," the officer responded: "I understand that but—." That means the government cannot rely on Jones's later statements to establish that his earlier statement was ambiguous.

And the California court's allusion to the fact that officers only interrogated Jones briefly after his invocation is of no matter. Even one question was one question too many. When an "individual indicates *in any manner*, *at any time* prior to or during questioning, that he wishes to remain silent, *the interrogation must cease.*" *Miranda*, 384 U.S. at 473–74 (emphasis added).

Nor does it matter, as the California court and federal district court seemed to suggest, that Jones did not repeat his request to remain silent later in the interrogation: "Under *Miranda*, the onus [is] not on [the suspect] to be persistent in [his] demand to remain silent. Rather, the responsibility f[alls] to the law enforcement officers to scrupulously respect

---

The dissent insists that we apply *Thompkins* to ensure that Jones invoked his right to remain silent "unambiguously," but the dissent doesn't want us to consider the Supreme Court's earlier cases describing what constitutes an ambiguous or unambiguous invocation. The dissent can't have it both ways. Either we apply *Thompkins*—and with it prior cases such as *Davis*, *Smith*, *Solem*, *Edwards*, and *Miranda* on which it builds—or we must ignore it. What we cannot do is say we are going to apply *Thompkins* and then ignore the standard *Thompkins* tells us to apply (the standards created in its right to counsel cases). If we ignore cases such as *Davis* and *Smith*, what standards for ambiguity are we to apply? Some new standard? That is exactly what *Thompkins* told us the Court would *not* do: "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Thompkins*, 560 U.S. at 381.

[his] demand." *United States v. Lafferty*, 503 F.3d 293, 304 (3d Cir. 2007). Relying on the fact that "[i]t was the defendant, not the interrogators, who continued the discussion," "ignores the bedrock principle that the interrogators should have stopped all questioning. A statement taken after the suspect invoked his right to remain silent 'cannot be other than the product of compulsion, subtle or otherwise.'" *Anderson*, 516 F.3d at 789–90 (quoting *Miranda*, 384 U.S. at 474).

Although we give considerable deference to the state courts, "AEDPA deference is not a rubber stamp." *Id.* at 786 (citing *Miller-El v. Dretke*, 545 U.S. 231, 240, 265 (2005)). The California Court of Appeal's determination that Jones's statement "I don't want to talk no more" was ambiguous based on his responses to further questioning, was either "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), or an "unreasonable application" of *Miranda*, *id.* § 2254(d)(1). By continuing to ask questions, the officers failed to "scrupulously honor" Jones's simple request. We accordingly hold that 28 U.S.C. § 2254(d) does not bar habeas review of Jones's *Miranda* claim, and we conclude, on de novo review, that Jones's constitutional rights were violated when his interrogation was used at trial.

## B. *Harmlessness*

*Miranda* error does not entitle Jones to habeas relief if the error was harmless. In AEDPA proceedings, we apply the actual-prejudice standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, habeas relief is only available if the constitutional error had a "substantial and injurious effect or influence" on the jury verdict or trial court decision. *Id.* at 623 (quoting *Kotteakos v. United States*,

328 U.S. 750, 776 (1946)).  This standard is satisfied if the record raises "grave doubts" about whether the error influenced the jury's decision.  *Davis v. Ayala*, 135 S. Ct. 2187, 2203 (2015) (brackets omitted) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Under AEDPA, we accord deference to a state court's harmlessness determination.  Nevertheless, because the *Brecht* standard that we apply on collateral review is "less onerous" for the state than the "harmless beyond a reasonable doubt" standard that state courts apply on direct review, *Brecht*, 507 U.S. at 622–23, the Supreme Court has explained that "it certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former," *Fry v. Pliler*, 551 U.S. 112, 120 (2007).  We therefore apply the *Brecht* test, but we do so with due consideration of the state court's reasons for concluding that the error was harmless beyond a reasonable doubt.  *Davis*, 135 S. Ct. at 2198.

In *Brecht*, the Supreme Court determined that the state's improper use of the petitioner's post-*Miranda* silence for impeachment purposes was harmless.  507 U.S. at 638–39. The state's physical evidence against the defendant was "weighty," and the state's references to the post-*Miranda* evidence were "infrequent."  *Id.* at 639.

The same cannot be said here.  Jones's own incriminating statements—made after he had invoked his right to silence—formed the backbone of the government's case. Indeed, there was little other evidence before the jury.  No witnesses identified Jones in relation to the shooting. Witnesses reported that a four-door vehicle with no body damage had been driven in the drive-by; Jones drove a two-

door vehicle with extensive body damage. The only evidence linking Jones to the shooting consisted of an informant who told detectives that Jones was involved with a rival gang, and that Jones drove a vehicle the same color (black) as the one used in the shooting. It is true that, prior to invoking his right to silence, Jones made some confusing comments about his whereabouts during the shooting, but that was weak tea compared with Jones's other words admitting to the crime. Jones likely could not have been convicted without his confession.

Importantly, the prosecutor repeatedly referred to Jones's incriminating statements, telling the jury that they could convict beyond a reasonable doubt based only on his own statements. The prejudice from a defendant's confession "cannot be soft pedaled." *Anderson*, 516 F.3d at 792. "A confession is like no other evidence"; it may be "the most . . . damaging evidence that can be admitted" against a defendant. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks omitted).

Exercising "extreme caution," as we must, "before determining that the admission of [a] confession at trial was harmless," *id.* at 296, we conclude that the admission of Jones's interrogation had a substantial and injurious effect on the jury's decision. *Brecht*, 507 U.S. at 637–38. In light of our decision, we do not reach Jones's remaining claims.

## IV. CONCLUSION

The Supreme Court has repeatedly made clear that when a suspect simply and unambiguously says he wants to remain silent, police questioning must end. Under any reasonable interpretation of the facts, Jones simply and unambiguously

invoked that right. Clearly established Supreme Court law required the suppression of Jones's interrogation. The State shall either release Jones or grant him a new trial.

**REVERSED and REMANDED.**

O'SCANNLAIN, Circuit Judge, dissenting:

A suspect who wishes to invoke his Fifth Amendment right to silence must do so "unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010). Well into his interrogation, the suspect in this case made a single statement that, standing alone, might be characterized as an unambiguous invocation of such right. The California courts determined, however, that the suspect's statement was not unambiguous when considered in full context. Whether one believes that determination to be correct or not, it unquestionably rests on a reasonable application of clearly established Supreme Court law to the facts of the case before us—and it must therefore stand under our deferential standard of review. *See* 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

In reaching its conclusion to the contrary, the majority faults the state court for failing to apply Supreme Court precedent that post-dates the state court's decision, attempts to extend readily distinguishable Supreme Court precedent to circumstances the Court has never considered, and ultimately grants relief to Jones because the state court's decision failed to conform to the majority's preferred view of the law—all of which we are forbidden from doing under § 2254.

I respectfully dissent.

## I

## A

Let's begin by restating the relevant facts.

After he was identified as the potential driver in a gang-related shooting that injured two teenagers and killed a third, Kevin Jones, Jr. was brought in for questioning by the Los Angeles Police Department.  LAPD Detectives Kevin Jolivette and Bill Fallon proceeded to interview Jones for a period of a few hours, beginning shortly after midnight on August 16, 2003.  After being informed of his constitutional rights, Jones spoke willingly with the detectives.  Throughout the interview, the detectives employed a ruse against Jones, telling him that both eye witnesses and security-camera footage identified his car as having been involved in the drive-by shooting.  The officers pressed Jones on both his and his car's whereabouts the night of the shooting, and they urged him to admit his involvement in the crime.

Jones spoke at length with the detectives, and as the majority recounts, his story changed considerably throughout the course of the interview.  After extensive interrogation, Jones clung to the assertion that on the evening of the crime, his car had gone missing for several hours, even though he admitted that no one other than him used the car.  Jones insisted that he had noticed his car missing from its parking space that evening, but for various reasons, he thought little of it and simply assumed that the car would be returned to him.  Rather than investigate where his car had been taken, Jones stated that he went to a nearby gym for a couple hours

and—as luck would have it—when he returned home, his car was back.

The detectives pressed Jones on the implausibility of this story, leading eventually to the following exchange:

> JOLIVETTE: Kevin, do you think – why don't you stop this man.
>
> JONES: All right.
>
> JOLIVETTE: Stop this. The thing is you drove a car, it shows that on the tape, and that's all I'm going to put down, as far as what you were doing. You drove the car. You just didn't know it was going to happen like that. Kevin, sit up, man.
>
> JONES: *I don't want to talk no more, man.*
>
> JOLIVETTE: I understand that, but the bottom line is –
>
> JONES *You don't want to hear what I'm telling you.*
>
> JOLIVETTE: I'm so sorry. I can't – you're mumbling, you got to speak up.  I got bad hearing.
>
> JONES: *I'm telling you all.*

At that point, the questioning proceeded as it had for hours, and in short order Jones admitted to driving the car during the

shooting. He professed innocence, however, insisting that a stranger had jumped into his car, ordered him to drive to the scene of the shooting, and then jumped out of the car, firing a gun at the victims. A few days later, police interviewed Jones again, and he again insisted on this latest version of his story.

## B

Jones was prosecuted largely on the strength of his incriminating statements and was found guilty by a jury of first degree murder, two counts of attempted murder, and other lesser crimes. Jones was sentenced to 75 years to life.

Jones appealed to the California Court of Appeal, arguing, among other things, that his incriminating statements should not have been introduced at trial, because they were obtained in violation of his Fifth Amendment right to silence. The California Court of Appeal disagreed, concluding that Jones's statement that he did not "want to talk no more" was ambiguous in context and it thus did not require police to end his interrogation. Jones filed a petition for review challenging this conclusion with the California Supreme Court, which the court denied without comment.

Jones then filed a federal habeas petition under 28 U.S.C. § 2254, which was denied by the district court. Jones timely appealed.

## II

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may grant relief only if the California

Court of Appeal's[1] rejection of Jones's right-to-silence claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)–(2). Time and again, the Supreme Court has reminded federal courts—and ours in particular—that this standard is "difficult to meet" and "highly deferential," which "demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

A decision is "contrary to" clearly established law where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or where it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from" the Court. *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court unreasonably applies clearly established federal law only if its determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. "[A]n *unreasonable* application of

---

[1] Because the California Supreme Court summarily denied review, we look through that denial to the reasoning given by the California Court of Appeal when it denied Jones's claim. *See Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir. 2013), *amended on denial of reh'g*, 733 F.3d 794 (9th Cir. 2013).

federal law is different from an *incorrect* application of federal law." *Id.* at 101 (quoting *Williams*, 529 U.S. at 410). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* (internal quotation marks omitted).

A state-court decision "will not be overturned on factual grounds unless *objectively* unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (emphasis added). "While not impossible to meet, that is a daunting standard—one that will be satisfied in relatively few cases, especially because we must be particularly deferential to our state-court colleagues." *Hernandez v. Holland*, 750 F.3d 843, 857 (9th Cir. 2014) (internal quotation marks omitted). Thus, a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

III

All parties agree on the foundational principle underlying this case: a suspect who seeks to invoke his Fifth Amendment right to silence must do so unambiguously. *See Thompkins*, 560 U.S. at 381–82. Once he does, the suspect's right to cut off questioning must be "scrupulously honored," *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975) (internal quotation marks omitted), and the "interrogation must cease," *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966). But interrogating officers have no duty to heed a request that—either on its face or in context—is "ambiguous or equivocal." *Thompkins*, 560 U.S. at 381–82.

The California Court of Appeal correctly acknowledged this rule, and determined that, in context, Jones did not unambiguously invoke his right to silence.  The court explained that immediately after Jones said he did not "want to talk no more," he continued, "You don't want to hear what I'm telling you."   The court opined that, "in context, considering his willingness to talk with the detectives before and after that point in the interview," Jones was not "unambiguously invoking his right to remain silent," but instead was "expressing frustration with the detectives' refusal to believe him."

There is little doubt that this factual conclusion—that, in the full context of Jones's interrogation, any invocation of his right to silence was ambiguous—is reasonable on the record before us.  When strung together, Jones's statements quite reasonably read as the state court portrayed them: not as a request for silence but as an expression of frustration by a person who wished the police would believe his story.  In the pivotal exchange, Jones's thoughts appear scattered and he seems upset, cutting off Detective Jolivette mid-sentence.  Further, neither before nor after this exchange did Jones even obliquely mention a desire for silence.  Indeed, for all but one isolated statement, Jones seemed perfectly willing to engage the detectives.  In context, it is not unreasonable to interpret that singular, stand-out statement as something other than a clear invocation of the right to remain silent.  Under AEDPA, that factual conclusion therefore must stand, unless it was based on an unreasonable misapprehension of clearly established law.  *See Wood*, 558 U.S. at 301–04; *Miller-El*, 537 U.S. at 340.

The majority does not seriously contest this conclusion, but instead asserts that clearly established law prohibited the

state court from considering this full factual context when evaluating the clarity of Jones's statement. Specifically, the majority holds that the state court could not find Jones's statement ambiguous based on *anything* Jones said after the precise moment he uttered, "I don't want to talk no more, man." *See* Maj. Op. at 4–5, 13–14. But the majority has failed to identify any case—alone or in combination with other cases—that clearly establishes anything of the sort.

A

The majority's assertion that ambiguity can never be provided by words a suspect says after he supposedly invokes his right to silence stems, at bottom, from a single Supreme Court case: *Smith v. Illinois*, 469 U.S. 91 (1984) (per curiam). But the Court's opinion in *Smith* has no bearing on the case before us and, in any event, does not stand for the remarkable proposition the majority attributes to it.

1

First, and most simply, at the time the state court issued its decision, *Smith*—a case examining the right to counsel—could not provide clearly established law for Jones's right-to-silence claim. In *Miranda v. Arizona*, the Supreme Court held that, during an interrogation, police must inform a suspect of both rights—his right to remain silent and his right to have an attorney present—and that they must cease all questioning upon the suspect's invocation of either right. 384 U.S. at 471–74. But, until last December, we had refused to treat cases defining the standards for invoking one right (e.g., the right to counsel) as clearly established law governing the standards for invoking the other right (e.g., the right to silence). *See Garcia v. Long*, 808 F.3d 771, 777 n.1

(9th Cir. 2015); *Anderson v. Terhune*, 516 F.3d 781, 787 n.3 (9th Cir. 2008) (en banc); *see also Bui v. DiPaolo*, 170 F.3d 232, 239 (1st Cir. 1999) (right-to-counsel precedent did not "authoritatively answer" question in a right-to-silence case, even though the Supreme Court "likely would" apply the same standard to both rights (internal quotation marks omitted)).

We recently changed our interpretation only because of intervening Supreme Court precedent. In 2010, the Supreme Court considered whether past decisions that required an invocation of the right to counsel to be unambiguous applied equally to a suspect who sought to invoke his right to silence. In *Berghuis v. Thompkins*, the Court held that the same standards indeed do apply, explaining that it saw "no principled reason to adopt different standards for determining when" either right had been invoked. 560 U.S. at 381. Accordingly, we recently held that, after *Thompkins*, right-to-counsel precedent now may indeed provide clearly established law in right-to-silence cases—despite our past practice to the contrary. *Garcia*, 808 F.3d at 777 n.1.

But, critically, this development in the law occurred *after* both the California Court of Appeal and the California Supreme Court issued their decisions on Jones's claim (in 2008). Under AEDPA, we may grant relief only if the state court's decision is irreconcilable with the law as clearly established by the Supreme Court *at the time the state court acted*. *Greene v. Fisher*, 132 S. Ct. 38, 44–45 (2011); *Pinholster*, 563 U.S. at 182. Before *Thompkins*, it was anything but clear that right-to-counsel cases governed right-to-silence claims. That very question was at the heart of the Supreme Court's grant of certiorari in *Thompkins*. *See Thompkins*, 560 U.S. at 381. Even if one agrees with the

Court's affirmative answer to that question, the point is that the answer had never been given *until Thompkins*.  *See id.*; *see also Anderson*, 516 F.3d at 799 (Tallman, J., dissenting) ("The United States Supreme Court has never declared its right to counsel principles applicable to invoking the right to silence, and under AEDPA that precedent was not 'clearly established' when the California Court of Appeal rendered its decision.").  Acting before *Thompkins*, the state court cannot possibly have failed reasonably to apply *Smith*'s right-to-counsel holding to Jones's right-to-silence claim.  Indeed, before *Thompkins*, not even our court would have evaluated Jones's claim under *Smith*.  *See Garcia*, 808 F.3d at 777 n.1.  Accordingly, any supposed error related to *Smith* cannot be a basis for upsetting the decision of the California Court of Appeal.

2

Second, even if *Smith* did govern Jones's right-to-silence claim, that case does not remotely stand for the sweeping propositions the majority attributes to it.  Jones's case is nothing at all like *Smith*, and the state court's refusal to extend *Smith* to Jones's situation is patently reasonable.  In short, even on its merits, *Smith* provides no basis on which to grant relief in this case.

a

In *Smith*, at the outset of police questioning, the suspect (Smith) stated that an unidentified woman told him to get an attorney.  469 U.S. at 92.  Shortly thereafter, when asked whether he understood his right to have an attorney present, Smith responded, "Uh, yeah.  I'd like to do that."  *Id.* at 93.  Rather than stop so that Smith could contact an attorney, the

officers continued to read his rights, and "then pressed him again to answer their questions." *Id.* After a somewhat confused back-and-forth about his right to an attorney, Smith ultimately agreed to speak without a lawyer present. *Id.* On review before the Supreme Court, Smith argued that all questioning should have ceased the moment he requested an attorney the first time. The State countered that it was unclear to the officers whether Smith actually wanted an attorney given that he agreed to proceed without one after further questioning.

The Supreme Court rejected the State's argument, and explained that once an unambiguous request for counsel has been made, "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 100 (emphasis omitted). This rule was needed to prevent officers from "badgering or overreaching" to "wear down the accused and persuade him to incriminate himself not withstanding his earlier request for counsel's assistance." *Id.* at 98 (internal quotation marks and alterations omitted). But questioning need not end where the accused's request "may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself." *Id.* at 99–100.

The rule of *Smith* is thus: once a suspect clearly invokes his right to counsel, officers may not continue to question him and use his answers to those questions to cast retrospective doubt on the clarity of his initial invocation. That is, ambiguity cannot be retroactively manufactured through the suspect's "postrequest *responses to further interrogation*." *Id.* at 100 (emphasis added). But Jones's critical statement—the utterance that the state court reasonably

determined cast doubt on what Jones meant by "I don't want to talk no more"—*was not a response to further interrogation*. Despite the majority's many assertions to the contrary, Maj. Op. at 4, 15, 21–23, the police did not ask Jones a single question between his two statements. They did not continue "interrogating" him at all. Indeed, Detective Jolivette did not even get out a complete sentence—it is anyone's guess what that sentence was going to be—before Jones cut him off to say, "You don't want to hear what I'm telling you." Jolivette's next comment was just to ask Jones to speak louder because he was having trouble hearing him. Jones then said, "I'm telling you all." *Only then*—at which point an officer quite reasonably may have been confused as to whether Jones was seeking to remain silent—did questioning continue. Jones never again hinted at a desire for silence.

This is nothing at all like the situation in *Smith*, where officers spoke to and questioned the suspect at length after he requested an attorney. In *Smith*, the State contended that the suspect's earlier request was unclear based only on his "*responses to continued police questioning.*" 469 U.S. at 97 (emphasis added). By contrast, the officers here asked Jones nothing, they did not continue interrogating him, and they certainly did not manufacture ambiguity by badgering Jones or wearing him down. *See id.* at 98. Instead, Jones's statement was ambiguous immediately, as confirmed by comments he made directly afterward. While those comments came later in time (barely), they were not the product of any "further interrogation" whatsoever. This situation is patently—and certainly reasonably— distinguishable from that in *Smith*.

If the limitations of *Smith* were not already obvious on the face of the Court's analysis, the Court took additional care to emphasize that its "decision [was] a narrow one." *Id.* at 99. That narrow decision did "not decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself." *Id.* at 99–100. And *Smith* certainly does not preclude the California courts from determining that Jones's situation presents just such a circumstance where the suspect's "request itself" was ambiguous. Even if on de novo review the majority would reach a different result, the majority's preferred interpretation is certainly not "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

b

The majority holds to the contrary only by misattributing to *Smith* a sweeping rule that case in no way embraced. The majority suggests that *Smith*'s prohibition against creating ambiguity on the basis of "postrequest responses to further interrogation" *actually* means that the police must disregard anything the suspect happens to say at a moment in time after he has arguably invoked his right to silence. *See* Maj. Op. at 4–5, 13–14. That is, even though context may render an otherwise apparently clear statement ambiguous, the majority concludes that such context can *never* be supplied by something the suspect says after his supposed request for silence.

The majority's reading not only stretches *Smith* to its breaking point, but it creates a rule that defies the basic logic of human interaction and which would have sweeping consequences for police officers. Consider, for example, a

situation in which there is no interruption by a police officer at all.  Suppose that during an interrogation a suspect said, "Man, I don't even want to talk about this anymore."  Then, after an uninterrupted pause, he continued, "This is so frustrating.  I'm answering all your questions, but you won't believe what I'm saying."  Must an officer plug his ears and ignore the latter two sentences, merely because they came after the first sentence?  Of course not.  *Smith* does not compel such a result, and anyone who has ever held a conversation would naturally reject it.  Indeed, albeit in an unpublished disposition, another panel of our court recently held that *Smith* allows officers to take into account the totality of just such a sequence.  In *United States v. Winsor*, a suspect stated, "I think I'd like an attorney," which after a "couple moments of silence," he followed with, "Shouldn't I have an attorney here?"  549 F. App'x 630, 633 (9th Cir. 2013) (mem.) (internal quotation marks omitted).  Our court held that the suspect's two sentences—which the police did not attempt to "engineer"—should be read together as a single statement that, as a whole, was not an unambiguous request for counsel.  *Id.*  Precedential or not, that decision certainly reflects a *reasonable* interpretation of *Smith*, which, again, is the low bar the State must clear.

And if *Smith* would allow an officer to consider two separate but uninterrupted sentences together as a single statement, we are left with a simple question: does *Smith* mandate a different result merely because an officer manages to eke out half a thought between the suspect's two sentences?  As explained above, plainly not.  *Smith* spoke of "responses to further interrogation" and was concerned with ambiguity manufactured through repeated questioning and badgering.  It says nothing for where, as here, an officer

merely says *something*—but does not interrogate, question, or badger—before the suspect continues talking.

The majority complains that such an interpretation of *Smith* somehow obscures the "bright-line" prohibition against continuing to interrogate a suspect after he has clearly invoked his right to silence. *See* Maj. Op. at 19 n.2. The majority claims that this interpretation would "create a gray area about how much [continued] interrogation is interrogation enough," and would allow officers to continue asking a suspect "some threshold number of questions." *Id.* Not so. I must emphasize once again: the police asked *no* questions between Jones's critical statements. The only "threshold number of questions" needed to distinguish this case from *Smith* is the simplest threshold of all: zero. If Jones had been forced to respond to even a single question—that is, if the police had continued to interrogate him at all—perhaps that would raise more difficult considerations regarding the precise limits of the rule set in *Smith*. Fortunately, in this case we need to recognize only that what *Smith* prohibits is "continued police questioning," 469 U.S. at 97, and "further interrogation," *id.* at 100—neither of which happened here.

At best, the majority's expansive rule represents an extension of *Smith* to a situation not contemplated by the Court in that case. Regardless how much the majority might prefer such an extension, that is not cause for relief under AEDPA. *See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) ("[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." (internal quotation marks omitted)). Fundamentally, the question before us is not whether the majority's expansive reading of *Smith* is correct or incorrect; the only question we

may consider is whether the state court could *reasonably*
interpret *Smith* more narrowly so as to distinguish it from the
situation before us.  Quite obviously it could.[2]

B

Despite superficial attempts to do so, the majority cites no
case that bridges the analytical gaps left unfilled by *Smith*.

The majority asserts that *Miranda v. Arizona* itself clearly
established that the police could not take into account
anything Jones uttered after he said that he did not "want to
talk no more."  *See* Maj. Op. at 4, 14–15.  Cherry-picking
quotations from *Miranda*, the majority argues that because
Jones indicated "in any manner" that he wished for silence,
the police were required to stop speaking to him.  *See* Maj.
Op. at 14–15, 23 (quoting *Miranda*, 384 U.S. at 473–74).

---

[2] Further, given the limitations of the record before us, I fail to see how
we could possibly conclude that it is unreasonable to characterize Jones's
comments as one continuous statement.  We do not have the benefit of an
audio recording, and thus we are left to guess just how rapid the exchange
between Jones and Jolivette was.  As the author of today's opinion
suggested at oral argument, one quite reasonable interpretation of our
limited record is that Jones and Jolivette spoke so quickly that they were
"stepping on each other's lines."  That is, perhaps the exchange was so
rapid that Jones's two statements came out "as almost one sentence that
has a little interruption in there."

Of course, the transcript *could* be read in a way to make this a more
difficult case for the government—for example if we infer a dramatic
pause between when Jones and Jolivette spoke.  But, once again, under
AEDPA we are not asked to determine what the best reading of the record
is (and certainly not what reading is most favorable to Jones).  We are
tasked only with determining whether the state court's view of the
exchange was reasonable.  It was.

But, despite the majority's selective quotations, it is decidedly *not* the law that police must cease speaking—or even questioning—once a suspect indicates that he wishes for silence "in any manner." Rather, the manner in which the suspect requests silence must be *unambiguous*; an "ambiguous or equivocal" request will not do. *Thompkins*, 560 U.S. at 381–82. Thus, at least as subsequently clarified by the Supreme Court, *Miranda* would better be described to hold that questioning must stop whenever a suspect requests silence "in any [unambiguous] manner." Despite its best efforts not to,[3] the majority concedes as much. *See* Maj. Op.

---

[3] The majority at times seems to suggest that our analysis should ignore the Supreme Court's holding in *Thompkins* that a suspect's request for silence must be unambiguous. *See* Maj. Op. at 20–21, 21–22 n.3. The majority argues that, if AEDPA prevents Jones from basing his claim on anything the Court wrote in *Thompkins*, *see supra* Part III.A.1, then the government must likewise ignore any aspect of *Thompkins* that confirms the correctness of the state court's decision. *See* Maj. Op. at 21–22 n.3. But we have every reason to treat the parties differently in this respect, and the majority's argument to the contrary would turn AEDPA on its head.

AEDPA prohibits us from granting relief unless the state court unreasonably applied federal law as clearly established at the time the state court acted. *See Greene*, 132 S. Ct. at 44–45. Thus, Jones cannot receive relief based on anything in *Thompkins*, because *Thompkins* came after the state court's decision in this case. *See supra* Part III.A.1. The government, on the other hand, is asked only to show that the state court's decision was *reasonable*. To do that, the government has no need to rely on *Thompkins* at all. Before *Thompkins*, we had held that it was at least *reasonable* for a court to conclude that a request for silence must be unambiguous, even if the Supreme Court had not clearly established as much. *See DeWeaver v. Runnels*, 556 F.3d 995, 1001–02 (9th Cir. 2009). Thus, in many ways, *Thompkins* is beside the point for the government in this case.

at 19 n.2 ("[*Miranda* and *Smith*] stand for the simple proposition that officers must stop questioning a suspect once he *unambiguously* invokes his right to silence . . . ." (emphasis added)). But that simply returns us to the same question we started with: what does it mean for a statement to be unambiguous, and what sort of factual context may an officer consider when interpreting the clarity of a statement? On these questions, *Miranda* provides no guidance at all.

Completely beside the point, the majority makes much of the Supreme Court's commands in *Miranda* and in *Michigan v. Mosley* that a valid request for silence must be

---

But, even if reference to *Thompkins* is not necessary to conclude that the state court's decision was reasonable, we may of course cite *Thompkins* to underscore that conclusion. It would be the very antithesis of deference for us to ignore the fact that state court's conclusion about ambiguity was later held by the Supreme Court to be correct. Given the standard of review erected by AEDPA, there is no contradiction in allowing the government to rely on a case even when Jones may not. *Cf. Lockhart v. Fretwell*, 506 U.S. 364, 372–73 (1993) (state may take benefit of new rules on collateral review even though petitioner may not).

Finally, I must observe that the majority and I have referenced *Thompkins* for two very different reasons. I cite *Thompkins* merely to confirm that the state court was right to conclude that Jones's request for silence needed to be unambiguous. The majority, however, seeks to use *Thompkins* to sustain its otherwise unsupportable assertion that the state court was compelled to follow all of the Supreme Court's prior cases discussing ambiguity in the right-to-counsel context. *See* Maj. Op. at 21–22 n.3. Again, before *Thompkins*, the Supreme Court had never held that right-to-silence invocations are governed by the same standards as right-to-counsel invocations. Even if the state court determined that both invocations need to be "unambiguous," it was by no means compelled also to conclude that the standards governing ambiguity must be the same in both contexts. As the majority itself points out, Maj. Op. at 16–17, there could reasonably be different standards that govern each right (even if that argument is *now* foreclosed by *Thompkins*).

"scrupulously honored."  *See* Maj. Op. at 15, 23.  It is true that *Miranda* and *Mosley* state unequivocally that police questioning must cease once the right to silence is invoked. But that command simply instructs officers how to behave once the right to silence *has* been unambiguously invoked. This case is about *whether* the right was ever unambiguously invoked, or more accurately, whether the state court reasonably determined that any invocation was ambiguous in context.  Neither *Miranda* nor *Mosley* speak to that question.[4]

Finally, the majority reverts to what is becoming an old habit of our court: citing federal circuit court cases to help bolster an attempt to extend Supreme Court precedent under federal habeas review.  *See* Maj. Op. at 15, 20, 22–23,  25 (citing *Garcia*, 808 F.3d at 771; *Anderson*, 516 F.3d at 781; *United States v. Lafferty*, 503 F.3d 293 (3d Cir. 2007)).  This we plainly cannot do.  *See Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (per curiam); *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam); *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450–51 (2013) (per curiam).  And even more, just like the majority's chosen Supreme Court cases, none of the Court of Appeals cases cited by the majority actually holds that a court can never infer ambiguity on the basis of statements made after a

---

[4] In the same vein, the majority discusses standards for evaluating a claim of waiver *after* the right to counsel has been invoked, as developed by the Supreme Court in cases such as *Edwards v. Arizona*, 451 U.S. 477 (1981). *See* Maj. Op. at 16–17.  Again, the case before us is strictly about *whether* Jones ever invoked his right to silence unambiguously; it has nothing to do with how we determine waiver after such an invocation has occurred.

supposedly clear request for silence.[5] Even if these cases were relevant under AEDPA review, they would not get the majority to its preferred destination.

In sum, the majority's rejection of the factual context provided by Jones's complete statements stems from an overly broad reading of *Smith* that is unsupported by reference to *Miranda*, *Mosley*, or any other case cited in the majority's opinion. Under AEDPA, the State court cannot be faulted for failing to anticipate the majority's de novo extension of the law.

IV

In this case, the California Court of Appeal: (1) identified the correct legal rule applicable to Jones's right-to-silence claim, (2) reasonably interpreted the facts underlying Jones's claim, and (3) reasonably applied that legal rule to those facts in rejecting the claim. The majority does not identify a single case—let alone a relevant Supreme Court case—that holds to the contrary or that even contemplates the situation in which Jones's claim arose. Instead, the majority essentially concludes that Supreme Court precedent ought to extend farther than it currently does, and—as has unfortunately

---

[5] Of the Court of Appeals cases, the majority relies most heavily on our en banc decision in *Anderson v. Terhune*, a case inapposite on its facts. There, officers ignored a suspect's "clear and repeated invocations of his right to remain silent" by feigning not to understand what he meant. *See* 516 F.3d at 785–86. Under AEDPA, we held that *Miranda* does not allow officers to "manufacture[] [ambiguity] by straining to raise a question regarding the intended scope of a facially unambiguous invocation of the right to silence." *Id.* at 787. This case says nothing for how a court must interpret a one-time statement rendered ambiguous nearly immediately afterward—and before police officers can even complete another sentence.

become routine for our court—chastises the state court for failing to predict and to adhere to the majority's preferred view of the law.

Because AEDPA prohibits federal courts from doing exactly that, I respectfully dissent.